The **NEW YORK CENTRAL RAILROAD COMPANY, a corporation, Plaintiff,**

v.

**NORFOLK & WESTERN RAILWAY COMPANY, a corporation, Defendant.**

**Civ. A. No. 2762.**

United States District Court
S. D. West Virginia,
Charleston Division.

Feb. 22, 1963.

Robert H. C. Kay, of Kay, Casto & Chaney, Charleston, W. Va., John E. Davis, Charleston, W. Va., of counsel, for plaintiff.

Ernest K. James, of McClintic, James, Wise & Robinson, Charleston, W. Va., A. Paul Funkhouser, Roanoke, Va., for defendant.

FIELD, Chief Judge.

Plaintiff, The New York Central Railroad Company, seeks an injunction pursuant to 49 U.S.C.A. § 1(20) against the construction and operation of trackage facilities by the defendant, Norfolk & Western Railway, from its present track on the northern side of the Kanawha River into the plant of Union Carbide Metals Company, a division of Union Carbide Corporation.

The facts, which are largely undisputed, are found to be as follows: For many years prior to 1930 the plaintiff, or the predecessor carriers in its system,[1] served the area on the north side of the Kanawha River and east of Charleston some 30 miles to Gauley Bridge. Traffic originating from this area was carried on a through line from Charleston through Columbus and into Toledo, Ohio. The Central also had a route from Charleston to Columbus over the track of the Hocking Valley Railway. Interchange connections with the Chesapeake and Ohio system in West Virginia were available at both Charleston and Gauley Bridge. Prior to 1930 the Virginian Railway Company, which by merger is now a part of the Norfolk and Western,[2] maintained lines running from Norfolk, Virginia, through Roanoke and into Princeton, West Virginia, and from there through the mountainous areas of southern Western Virginia to Deepwater on the southerly bank of the Kanawha River. This main line connected at Deepwater with the Chesapeake and Ohio and at Matoaka with a line of the Norfolk and Western. During this same period the Chesapeake and Ohio maintained lines .from Newport News, Virginia, through Richmond and from there to the west into Charleston and on through Columbus into the Great Lakes territory.

Prior to 1930, in order to move traffic of the New York Central lines to and from the Virginian, it was necessary to utilize the intermediate service of the Chesapeake and Ohio over its line along the south bank of the Kanawha River between Deepwater and Charleston for a distance of some 34 miles. In order to eliminate this dependence upon the Chesapeake and Ohio and to effect a reciprocal gateway for the New York Central and the Virginian, the latter on April 16, 1929, filed an application under Title 49 U.S.C.A. § 1(18) for a certificate of convenience and necessity authorizing an extension of its main line by bridge a distance of about one mile across the Kanawha River from a point at Deepwater to a point of connection with the tracks of the New York Central system on the northerly side of the river, a short distance east of Gauley Bridge. As stated, the objective of the Central and the Virginian was to provide a competitive route from the Tidewater to the Great Lakes independent of the Chesapeake and Ohio. At the hearings on that application it was represented by the parties and conceded by them that the proposed extension would not serve any local need nor itself originate any traffic. After those hearings and over the strenuous objections of the Chesapeake and Ohio, the Commission filed its report and granted the requisite certificate of convenience and necessity on May 5, 1930. See Interstate Commerce Commission Finance Docket No. 7562.

Pursuant to the authority granted by the Commission, Virginian constructed a bridge from Deepwater on the south to the northerly side of the Kanawha

1. The immediate predecessor of the plaintiff in the area involved in this controversy was the Kanawha and Michigan Railroad which at times will be referred to by name in this opinion.

2. The merger of Virginian Railroad Company and Norfolk & Western Railway Company was approved by the Interstate Commerce Commission in Finance Docket 20599 under date of October 8, 1959. In the area of the present controversy, however, the Commission order, together with the collateral papers and agreements, neither enlarges nor diminishes the rights held by the Virginian, and the position of the Norfolk and Western in the present action necessarily rests upon such rights as were vested in the Virginian prior to the merger.

River. Incident to the construction of the bridge the Virginian acquired a strip of land on the north side of the Kanawha River which abutted upon the property of Union Carbide Metals Company. A connection between the Virginian and the New York Central was effected on the north side of the river at a point known as the "D B" Tower. Mutually acceptable agreements were entered into between the Virginian and the New York Central for operation of freight trains between the Virginian's yard at Elmore and the Central's yard at Dickinson, West Virginia. Under these agreements it was provided that such trains while operating over the New York Central's Railroad would be considered trains of that carrier, and conversely while operating over the Virginian's Railroad they would be considered trains of the Virginian. The reciprocal cutoff point under this agreement was the arrival of the engine of either a west or east bound train at the Bridge office located at the "D B" Tower. A certificate of convenience and necessity was issued by the Interstate Commerce Commission on March 14, 1931, authorizing the Virginian to operate certain passenger trains over the tracks of the Kanawha and Michigan from the Deepwater Bridge into Charleston. See I.C.C. Finance Docket No. 8691. Prior to that time the passenger trains of the Virginian had moved into Charleston over the Chesapeake and Ohio tracks on the south side of the Kanawha River. Passenger service into Charleston was finally discontinued sometime in the year 1952.

The relationship of New York Central with Union Carbide Metals Company dates back to a sidetrack agreement executed on December 15, 1919, between Kanawha and Michigan Railway Company and West Virginia Eagle Coal Company. This agreement was assigned to Electro Metallurgical Company under date of April 3, 1930, the assignment being ratified by the New York Central Railroad Company which at that time was the lessee of the Kanawha and Michigan. Intermediately, a more elaborate sidetrack agreement was entered into on November 19, 1929, between the Kanawha and Michigan and Electro Metallurgical Company. This latter agreement provided for the establishment of several sidetracks incident to the Metallurgical Company's operation and spelled out the responsibilities and the rights of the parties thereunder. Various supplemental agreements were entered into between the parties and on November 30, 1948, these agreements were assigned to Union Carbide and Carbon Corporation by Electro Metallurgical which assignment was ratified and approved by the New York Central. The right of way of the New York Central runs parallel and adjacent to the property and plant of the Union Carbide Metals Division and a main track and three switching tracks are maintained by the Central to serve a multiplicity of sidings located in various parts of the plant operation. Under the present method of operation, traffic coming into the plant from the Norfolk and Western is carried down to the Dickinson yards some 17 miles west of the plant and from there is transported back over the New York Central line and into the plant. Outbound traffic is similarly handled, being taken first to the Dickinson yards and there placed upon trains destined for points over the Norfolk and Western.

The Norfolk and Western has started a proposed track construction from a point on its property at the northerly end of the Deepwater Bridge and leading into the property of Union Carbide Metals Company. This track, if completed, would be used exclusively to switch cars to and from the plant incident to line-haul movement. The proposed track would be 2640 feet in overall length, and of this, 1620 feet would be constructed by the industry at its expense and upon its land which abuts upon the property of the Norfolk and Western. The remaining 1020 feet would lie entirely upon Norfolk and Western property, and 360 feet of this portion was constructed in October, 1960, at a cost of approximately $8,000.00. This is presently termed a storage track. The total construction

cost of the track would be $42,000.00, of which amount $26,500.00 would be borne by the industry. Concededly, the proposed track would serve only Union Carbide Metals Company, and it would be physically impossible to utilize it to serve any other industry in the area. The proposed track would provide no passenger, telephone or telegraph service nor any shipper facilities such as a station or loading platforms. By its nature, it is quite evident that the proposed construction would require no special financing nor condemnation of property or use of land owned or controlled by any third parties.

Under the proposed construction the Norfolk and Western would serve the plant direct and it would not be necessary to afford the New York Central any division of the revenues accruing on such traffic. By eliminating the participation of the New York Central in these revenues, the Norfolk and Western is in a position and has agreed to initiate freight rate reductions on a number of commodities used by the plant. An example of such reductions is 50¢ per ton on silica gravel, 33¢ per ton on coal and 62¢ per ton on stone, all of which are basic commodities originating on or carried over the Norfolk and Western. Under the proposal the plant would also have available more adequate train schedules to certain points than presently exist. Based upon traffic movement during the period July, 1961, through June 30, 1962, the reduced rate under the proposal would effect a reduction in the annual freight bill of the plant of approximately $48,-000.00 and would increase the annual revenues of the Norfolk and Western approximately $25,000.00. During that same period the plant had a rail freight bill of approximately four million dollars. Union Carbide Metals Company is presently in an unfavorable competitive position, and is most desirous of realizing the saving which would result from its reduced freight bill. For this reason the Union Carbide Metals Company requested the proposed construction and

is an advocate of the position of the defendant in this litigation.

It is necessary to make a determination from these facts whether the proposed construction is an extension proscribed by 49 U.S.C.A. § 1(20) or is merely a spur, industrial, team, switching or sidetrack which under 49 U.S.C.A. § 1 (22) may be constructed without the necessity of a certificate from the Interstate Commerce Commission. In the landmark case of Texas & P. Ry. Co. v. Gulf, etc., Ry. Co., 270 U.S. 266, 46 S. Ct. 263, 70 L.Ed. 578, in speaking of tracks permitted under the provisions of § 1(22), Mr. Justice Brandeis made the following observation (page 278, 46 S. Ct. page 266):

"* * * Tracks of that character are commonly constructed either to improve the facilities required by shippers already served by the carrier or to supply the facilities to others, who being within the same territory and similarly situated are entitled to like service from the carrier. The question whether the construction should be allowed or compelled depends largely upon local conditions which the state regulating body is peculiarly fitted to appreciate. Moreover, the expenditure involved is ordinarily small. But where the proposed trackage extends into territory not theretofore served by the carrier, and particularly where it extends into territory already served by another carrier, its purpose and effect are, under the new policy of Congress, of national concern. For invasion through new construction of territory adequately served by another carrier, like the establishment of excessively low rates in order to secure traffic enjoyed by another, may be inimical to the national interest. If the purpose and effect of the new trackage is to extend substantially the line of a carrier into new territory, the proposed trackage constitutes an extension of the railroad within

the meaning of paragraph 18, although the line be short and although the character of the service contemplated be that commonly rendered to industries by means of spurs or industrial tracks. Being an extension, it cannot be built unless the federal commission issues its certificate that public necessity and convenience require its construction. * * * "

In cases of this type, the district courts have developed certain standards or criteria to distinguish spur tracks from line extensions. See Pennsylvania Railroad Co. v. Reading Company, D.C., 132 F.Supp. 616, and Chicago, Milwaukee, St. P. & P. R. Co. v. Northern Pac. R. Co., D.C., 120 F.Supp. 710. The composite criteria recognized in these two cases can be categorized as follows:

(1) Will the proposed track serve only a single carrier?

(2) Will the construction provide passenger, telephone, telegragh, loading platform or station service?

(3) Is the length of the proposed line of substantial significance?

(4) Will the proposed trackage be used only for switching service incident to line-haul movement?

(5) Is the cost of the proposed construction reasonable and has the railroad been requested by the customer to give it service?

(6) Does the proposed construction involve special financing or condemnation proceedings?

(7) Does the proposed construction invade the territory of another railroad?

(8) Will the proposed connection provide service to the single customer similar to that provided other industries in the same area and similarly situated?

(9) Is the proposed track to improve rail facilities required by shippers who are already being served?

(10) Will the track extend into "virgin territory?"

(11) Is the territory to be served by the proposed track within or adjacent to a general area or community already being adequately served by another carrier?

The first eight of these tests were itemized in the Reading case, and the court concluded that the proposed construction satisfied the requirements and that no certificate from the federal commission was required. However, the facts of that case indicate that a competitive condition already existed between the two carriers and the proposed construction would merely improve the position of the defendant carrier and in that manner further intensify the competition. In the great majority of cases, however, where a competitive condition does not exist between the carriers and the proposed construction will invade new territory not previously served, the construction has been held to be an extension within the meaning of Section 1 (18), and its construction has been forbidden unless and until a certificate of convenience and necessity has been obtained from the Interstate Commerce Commission. See Texas & P. Ry. v. Gulf, etc., Ry., supra; Union Pac. R. Co. v. Denver & Rio Grande Western R. Co., 10 Cir., 198 F.2d 854; Chicago, Rock Island & P. R. Co. v. Chicago & N. W. Ry. Co., D.C., 188 F.Supp. 549; Chicago, Milwaukee, St. P. & P. R. Co. v. Northern Pac. R. Co., supra. While the proposed construction in this case satisfies the first six of the itemized criteria, it does not meet the requirements of the final six items, all of which are directed to the vital question of whether the construction constitutes an invasion of the territory of another carrier.

The evidence clearly shows that the territory which the Virginian was author-

ized to serve prior to 1930 terminated at the south bank of the Kanawha River. The certificate of convenience and necessity issued by the Interstate Commerce Commission in Finance Docket No. 7562 under which the Deepwater Bridge was constructed did not grant the Virginian any rights in the territory north of the Kanawha River. The certificate was issued for the purpose of authorizing the extension to provide a direct connection with the line of the Kanawha and Michigan. The sole purpose of that extension was to establish a reciprocal and noncompetitive connection between the Virginian and the Kanawha and Michigan, and not for the purpose of originating any traffic for the Virginian on the north side of the river. The restrictive purpose of that extension is further indicated by the Commission Report in Finance Docket No. 8691 relative to passenger service from Deepwater to Charleston. The following language was used therein: "There is to be no extension of applicant's line for freight service. The freight revenues between the applicant and the New York Central will divide at the west [north] end of the bridge." While I agree with counsel for the defendant that representations made by counsel for the Virginian incident to the application for the extension in 1930 should not at this time be considered in the nature of an estoppel, nevertheless it is my opinion that these representations together with the other matters and reports incident to both that application as well as No. 8691 are material upon the question of the scope of the Virginian's rights under the certificate of convenience and necessity issued May 5, 1930, by the Commission.

In my opinion the evidence here clearly shows that the effect of the proposed construction would be to extend the defendant's operations into an area not previously served by it which is immediately adjacent to and presently served by the plaintiff's line. Under these circumstances, it constitutes an extension of the line within the meaning of paragraph (18) and the construction is unlawful until and unless the defendant shall have applied to the Interstate Commerce Commission and received a proper certificate of convenience and necessity. See Chicago, Rock Island & P. R. Co. v. Chicago & N. W. Ry. Co., supra.

Counsel for defendant contends that cases cited by the plaintiff are inapposite, stating that in the cited cases there was no showing of advantage to any shipper or the public generally as a result of the proposed construction, nor any showing that the proposed trackage would afford improved service or offer any advantage in service or rates to the shippers or public affected thereby. The answer to this contention is well stated in the opinion in Chicago, Rock Island & Pac. R. Co. v. Chicago & N. W. Ry. Co., supra, at 553 of 188 F.Supp.:

"* * * That evidence in each instance is probative, not of the factual question which the court has to decide, but of the question whether public convenience and necessity would require that defendant enter the area in competition with plaintiff. This court has nothing to do with that question of public convenience and necessity, since Congress has entrusted its decision to the jurisdiction of the Commerce Commission. * * *"

See also Chicago, Milwaukee, St. P. & P. R. Co. v. Northern Pac. R. Co., supra, at 712 of 120 F.Supp.

Counsel may consider this opinion as my findings of fact and conclusion of law to the effect that the proposed construction by the defendant constitutes an extension within the meaning of 49 U.S.C. A. § 1(18) which requires an appropriate certificate from the Interstate Commerce Commission and accordingly will be enjoined. Counsel may prepare an order incorporating this opinion by reference therein.