The NEW YORK CENTRAL RAILROAD COMPANY, a corporation, Plaintiff,

v.

SOUTHERN RAILWAY COMPANY, a corporation, Defendant.

No. 62 C 1849.

United States District Court
N. D. Illinois, E. D.

Feb. 5, 1964.

464

Richard J. Murphy, Jack Rand, Chicago, Ill., for plaintiff.

Bruce E. Brown, Chicago, Ill., for defendant.

JULIUS J. HOFFMAN, District Judge.

In this suit the plaintiff, The New York Railroad Company, seeks to have the court enjoin the defendant, Southern Railway Company, from operating over private mine trackage owned by the Peabody Coal Company, running between Southern's Boonville, Indiana, agency station and Peabody's Lynnville Mine, and it is also sought to have the court restrain the defendant from serving that mine.

The action arises under section 1, paragraphs 18–22, of the Interstate Commerce Act, 49 U.S.C. § 1(18)–(22). The plaintiff and the defendant are both common carriers by railroad operating in interstate commerce, and as such are subject to the provisions of Part I of the Interstate Commerce Act, 49 U.S.C. §§ 1–27, including National Transportation Policy, 49 U.S.C., preceding § 1. The plaintiff and the defendant are duly authorized to do business as foreign corporations in Illinois, both maintaining offices within the territorial limits of the District Court of the United States for the Northern District of Illinois, Eastern Division. This court thus has jurisdiction of the cause and of the parties.

## THE PRINCIPAL FACTS

A portion of the plaintiff's line of railroad known as the Tecumseh Branch extends from a point known as Buckskin Station in Gibson County, Indiana, easterly to and through a point on its railroad known as Lynnville in Warrick County, Indiana, which is approximately five miles easterly of Buckskin Station. The plaintiff constructed this branch under authority of a certificate of public convenience and necessity which it sought and obtained from the Interstate Commerce Commission in 1938. Cleveland, C., C. & St. L. Ry. Construction and Operation, 228 I.C.C. 461 (1938). In its report, the Commission found as follows:

"The primary purpose of the proposed extension is to supply car and transportation service for coal to be

mined from certain undeveloped coal lands in the so-called Dickeyville field, and particularly from a mine to be operated by the Tecumseh Coal Corporation, * * * which is now in the process of organization. * * * There is no other railroad serving the same general territory. The nearest railroad to the proposed line, other than that of the applicants, is the line of the Southern Railway extending from Evansville to Huntingburg, but it is about 7 or 8 miles distant at the nearest point.

" * * *

" * * * The record shows a public need for the proposed construction in that it will develop a virgin coal field not now supplied with transportation facilities, and will result in a substantial increase in the business of the New York Central without diverting any traffic now handled by another line of railroad." 228 I.C.C. at 462–63.

Development of the coal lands in the area of the plaintiff's Tecumseh Branch led to the opening of the Lynnville Mine, now owned by Peabody. The coal tipple of that mine is located approximately 350 feet south of plaintiff's branch. The tipple was constructed during 1952 and commenced operation on December 7, 1952. In 1952 and 1953, the plaintiff expended $253,105.95 for capital improvements for track, communications, signals, and station facilities in the vicinity of Lynnville, for the purpose of providing rail service to the Lynnville Mine. During 1962, the plaintiff originated 25,679 carloads of bituminous coal at this mine, containing 1,570,768 tons of bituminous coal, as compared with 21,426,315 tons of bituminous coal at all mines served by the plaintiff. During 1962, the tonnage of bituminous coal transported by the plaintiff was 40.2 percent of the total tonnage of carload freight carried by the plaintiff during that year.

The defendant operates a line of railroad easterly from the City of Evansville in Vanderburgh County, Indiana, to and through a point on its railroad known as Boonville Station in Warrick County, Indiana, approximately seventeen miles east of Evansville. Southern constructed and for many years has owned and maintained a track approximately 1.4 miles long running northerly from its main line at Boonville, called Southern's Sunlight Spur. Peabody owns and maintains a private track approximately ten miles long (hereinafter called the Peabody track) extending northerly from a connection with the old Sunlight Spur of Southern to the Lynnville Mine of Peabody. This track is located on land either owned by Peabody or over which Peabody has an easement for the track. The Peabody track, except for the last 5,150 feet at the northern end, was built at various times between 1945 and 1954. Various parties participated in the construction of the northerly 5,150 feet of track. On 2,150 feet, Peabody did the sub-grading, construction, and spreading of ties in 1955; on the other 3,000 feet, the sub-grading was done by the Olinger Construction Company in August, 1955. In September, 1958, at the request of Peabody, Southern completed the construction of the northerly 5,150 feet adjacent to the Lynnville Mine at a cost of $26,381, including the cost of material and labor. On April 8, 1963, Peabody paid to Southern $25,000, and in consideration thereof Southern gave Peabody a bill of sale for all its interest in the northerly 5,150 feet of the Peabody track. On January 10, 1959, the defendant commenced operations over the private Peabody track for the sole purpose of serving Peabody at the Lynnville Mine, and the defendant has not used the Peabody track to serve anyone except Peabody. The defendant has not applied for nor obtained certification under section 1(18) of the Interstate Commerce Act to operate over this trackage or to serve the Lynnville Mine.

## THE ISSUES

The plaintiff alleges in its complaint that defendant's operation over the private Peabody track to serve the Lynnville Mine is an extension of defendant's line within the meaning of section 1(18)

of the Interstate Commerce Act, which provides that no carrier subject to the Act shall undertake the extension of its line of railroad unless it first obtains a certificate of public convenience and necessity from the Interstate Commerce Commission. Section 1(20) of the Act provides that any construction, operation, or abandonment contrary to paragraph 18 may be enjoined by any court of competent jurisdiction at the suit of any party in interest. The plaintiff contends that under these provisions, the defendant should be enjoined from further operation over the Peabody track unless and until the defendant obtains proper certification from the Commission as required under paragraph 18.

The defendant denies, in its answer, that its operation from Boonville to Peabody's Lynnville Mine is an extension of its line within the meaning of section 1(18) and asserts that no authority from the Interstate Commerce Commission is required under section 1(18) for this operation. The defendant further alleges that it operates on the Peabody track to serve only the Peabody mine, that it has no right to use the Peabody track to serve anyone else, and that it does not hold itself out by tariff or otherwise to serve the general public over this track. Therefore, the defendant insists, this operation is merely a switching operation purely incidental to the roadhaul service of the defendant beyond Boonville, from which point the defendant's tariffs for roadhaul service apply.

The defendant further takes the position that by virtue of the private Peabody track which connects with the defendant's line, the Lynnville Mine is an industry located on the defendant's line; consequently, the defendant asserts, its operation to the Lynnville Mine does not constitute an invasion of the territory of the plaintiff, since the defendant is simply rendering switching service to an industry located on its line.

The parties have entered into stipulations which cover substantially all of the facts here involved. The only issues of fact raised are in regard to the relevancy and weight of certain evidence presented as well as the interpretation to be placed upon that evidence. The case was tried to the court without a jury and was taken under advisement on the trial record and memoranda submitted by counsel.

■ Both the plaintiff and defendant agree that the single issue to be decided in this proceeding is whether the defendant's operation over the private Peabody trackage to serve the Lynnville Mine constitutes an extension of line within the meaning of section 1(18) of the Interstate Commerce Act. This court has no jurisdiction to decide whether the defendant's service of the Lynnville Mine, if an extension of line within the meaning of section 1(18), is required by "the present or future public convenience and necessity." That question is the exclusive province of the Interstate Commerce Commission. New York C. R. R. v. Norfolk & W. Ry., 214 F.Supp. 549, 554 (S.D.W.Va.1963).

Section 1(18) provides, in pertinent part as follows:

"No carrier by railroad subject to this chapter shall undertake the extension of its line of railroad, or the construction of a new line of railroad, or shall acquire or operate any line of railroad, or extension thereof, or shall engage in transportation under this chapter over or by means of such additional or extended line of railroad, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity require or will require the construction, or operation, or construction and operation, of such additional or extended line of railroad * * *."

Section 1(22) provides, in pertinent part, as follows:

"The authority of the Commission conferred by paragraphs (18) to (21) of this section, both inclusive, shall not extend to the construction or abandonment of spur, industrial, team, switching, or side tracks,

located or to be located wholly within one State * * *."

The plaintiff places principal reliance upon Texas & Pac. Ry. v. Gulf, Colo. & S. F. Ry., 270 U.S. 266, 46 S.Ct. 263, 70 L.Ed. 578 (1926), in contending that the defendant's operation to serve the Lynnville Mine is an extension of the defendant's line of railroad under section 1(18). As the plaintiff states, the Texas & Pacific case is the landmark decision under paragraph 18 defining the difference between construction of an extension of line, for which Commission authority is required under paragraph 18, and construction of industrial trackage, wholly within one state, within the paragraph 22 exception. In that case, the Supreme Court, in an opinion by Mr. Justice Brandeis, held that proposed trackage, 7½ miles in length, to be constructed by the defendant carrier, constituted an extension of line, where the line was to serve an industrial area not previously served by the defendant, and being served by the plaintiff. The defendant carrier argued

"* * * that a branch is a line serving one or more stations beyond the point of junction with the main line or another branch, and to or from which stations regular tariff rates are in effect; that an industrial track is a line constructed to serve or reach industries over which regular scheduled passenger or freight train service is not performed and for transportation over which only a switching charge, if any, is made; and that neither the length of the line, nor the character of the construction, can convert into a branch a line of nature described."

270 U.S. at 276–277, 46 S.Ct. at 265–266, 70 L.Ed. 578. The defendant carrier, in support of its contention, relied upon definitions of these terms in use by the Interstate Commerce Commission for accounting purposes, and by the Commission, courts, and state legislatures for other purposes. In rejecting this definition, and promulgating its own definition of extension under section 1(18), the Court stated as follows:

"A truer guide to the meaning of the terms extension and industrial track, as used in paragraphs 18 to 22, is furnished by the context and by the relation of the specific provisions here in question to the railroad policy introduced by Transportation Act, 1920. By that measure, Congress undertook to develop and maintain, for the people of the United States, an adequate railway system. It recognized that preservation of the earning capacity, and conservation of the financial resources, of individual carriers is a matter of national concern; that the property employed must be permitted to earn a reasonable return; that the building of unnecessary lines involves a waste of resources and that the burden of this waste may fall upon the public; that competition between carriers may result in harm to the public as well as in benefit; and that when a railroad inflicts injury upon its rival, it may be the public which ultimately bears the loss. See Railroad Commission [of State of Wash.] v. Chicago, Burlington & Quincy R. R. Co., 257 U.S. 563 [42 S.Ct. 232, 66 L.Ed. 371]; The New England Divisions Case, 261 U.S. 184 [43 S.Ct. 270, 67 L.Ed. 605]; The Chicago Junction Case, 264 U.S. 258 [44 S.Ct. 317, 68 L.Ed. 667]; Railroad Commission [of State of Cal.] v. Southern Pacific Co., 264 U.S. 331 [44 S.Ct. 376, 68 L.Ed. 713]. The Act sought, among other things, to avert such losses.

"When the clauses in paragraphs 18 to 22 are read in the light of this congressional policy, the meaning and scope of the terms extension and industrial track become clear. The carrier was authorized by Congress to construct, without authority from the Commission, 'spur, industrial, team, switching or side tracks * * * to be located wholly within one State.' Tracks of that

character are commonly constructed either to improve the facilities required by shippers already served by the carrier or to supply the facilities to others, who being within the same territory and similarly situated are entitled to like service from the carrier. The question whether the construction should be allowed or compelled depends largely upon local conditions which the state regulating body is peculiary (sic) fitted to appreciate. Moreover, the expenditure involved is ordinarily small. But where the proposed trackage extends into territory not theretofore served by the carrier, and particularly where it extends into territory already served by another carrier, its purpose and effect are, under the new policy of Congress, of national concern. For invasion through new construction of territory adequately served by another carrier, like the establishment of excessively low rates in order to secure traffic enjoyed by another, may be inimical to the national interest. If the purpose and effect of the new trackage is to extend substantially the line of a carrier into new territory, the proposed trackage constitutes an extension of the railroad within the meaning of paragraph 18, although the line be short and although the character of the service contemplated be that commonly rendered to industries by means of spurs or industrial tracks."

270 U.S. at 277–278, 46 S.Ct. at 266, 70 L.Ed. 578.

The plaintiff urges that, under the above decision, the defendant's operation to serve the Lynnville Mine must be regarded as an extension of line because this mine or territory has not previously been served by the defendant and because it is alredy served by the plaintiff.

The difficulty with this theory is that it overlooks certain significant differences between the facts involved in the instant case and the facts involved in Texas & Pacific. In the latter, the defendant was to construct the projected trackage, own it, and operate it. The only question, therefore, was whether the defendant's construction of track fell within the purview of paragraph 22, excepting from the scope of paragraph 18 the construction of industrial track. The plaintiff cites a number of cases [1] which have followed the Texas & Pacific decision, but in none of them was the track involved wholly owned and operated by a party other than the carrier sought to be enjoined.

The defendant contends, and I agree, that other cases have demonstrated that the operation of trains by a carrier over private track owned and maintained by the mine or industry exclusively served by the carrier over that track is not an extension of line within the meaning of section 1(18), where the carrier does not serve or hold itself out to serve the general public over that track. No decision directly in point has come to my attention; [2] nevertheless, a consideration

1. Union Pac. R.R. v. Denver & R. G. W. R.R., 198 F.2d 854 (10th Cir. 1952); Missouri Pac. R.R. v. St. Louis S. W. Ry., 73 F.2d 21 (8th Cir. 1934); Southern Pac. R.R. v. Western Pac. C. R.R., 61 F.2d 732 (9th Cir. 1932); Missouri Pac. R.R. v. Chicago, R. I. & P. Ry., 41 F.2d 188 (8th Cir. 1930); New York C. R.R. v. Norfolk & W. Ry., 214 F.Supp. 549 (S.D.W.Va.1963); Chicago, R. I. & P. Ry. v. Chicago & N. W. Ry., 188 F. Supp. 549 (S.D.Ill.1960); Chicago, M., St. P. & P. R.R. v. Northern Pac. R.R., 120 F.Supp. 710 (W.D.Wash.1954), affirmed, 225 F.2d 840 (9th Cir. 1955); Chicago, R. I. & P. Ry. v. Illinois Commerce Commission, 414 Ill. 134, 111 N.E. 2d 136 (1953). Cf., Chesapeake & O. Ry. v. United States, 283 U.S. 35, 51 S.Ct. 337, 75 L.Ed. 824 (1931); El Dorado & W. Ry. v. Chicago, R. I. & P. Ry., 5 F. 2d 777 (8th Cir. 1925); Gilmore v. Sandersville R.R., 149 F.Supp. 725 (1955).

2. Atlantic Coast Line R.R. v. Southern Ry., Civil Action No. 382 (S.D.Ga., Sept. 22, 1954), an unpublished opinion relied upon by defendant, appears to be closely in point; however, the opinion cites no authority and its holding may be explained by the principle followed in Missouri, K. & T. R.R. of Texas v. Texas & N. O.

of various decisions concerning private tracks, together with the language of paragraph 18 and other portions of the Interstate Commerce Act, lead me to conclude that the operation here in question is not an extension of line of the defendant railroad under paragraph 18.

The most persuasive decisions discussed by the defendant in support of its position are a series of cases involving certain private track about three miles long constructed and maintained by the Dering Coal Company between its mine and the line of the Cleveland, Cincinnati, Chicago and St. Louis Railway Company, known as the "Big Four." The mine had previously been served by the Illinois Central, but the coal company desired improved service, and the Illinois Central did not oppose service of the mine by the Big Four. The track constructed by the coal company crossed the lines of the Illinois Central and the Southern Illinois Railway and Power Company, and for the privilege of these crossings the mine company granted both railroads the right to operate over its track for the purpose of serving mines located on the Big Four. Because of these agreements, the Big Four refused to install a switch connecting the Dering track with its line, which connection would enable the Illinois Central to reach mines on the Big Four line.

Dering applied to the Interstate Commerce Commission for an order under section 1(9) of the Interstate Commerce Act [3] compelling the Big Four to install a switch connection. The Commission, through Division 5, granted the order, J. K. Dering Coal Co. v. Cleveland, C., C. & St. L. Ry., 96 I.C.C. 143 (1925), and on rehearing the full Commission affirmed, 109 I.C.C. 55 (1926). The order was ultimately upheld by the Supreme Court in Cleveland, C., C. & St. L. Ry. v. United States, 275 U.S. 404, 48 S.Ct. 189, 72 L.Ed. 338 (1928), in an opinion written by Mr. Justice Brandeis—author of the earlier Texas & Pacific opinion.

Two issues in that case, and the manner in which they were resolved, are significant for present purposes. The Big Four argued, first, that the Commission's power to order a carrier to make a switch connection with a private side track, under paragraph 9, had been abrogated by enactment of paragraphs 18 through 22. In rejecting this contention, the Court stated as follows:

"Paragraph 22 in no way affects the power conferred by paragraph 9. By its terms, it operates as a limitation only upon the authority conferred upon the Commission in 1920 by paragraphs 18 to 21. *These paragraphs relate to the construction, acquisition, extension and abandon-*

R.R., 172 F.2d 768 (5th Cir. 1949), as well as by the theory here relied upon by defendant.

3. Section 1(9) provides as follows:
"Any common carrier subject to the provisions of this chapter, upon application of any lateral, branch line of railroad, or of any shipper tendering interstate traffic for transportation, shall construct, maintain, and operate upon reasonable terms a switch connection with any such lateral, branch line of railroad, or private side track which may be constructed to connect with its railroad, where such connection is reasonably practicable and can be put in with safety and will furnish sufficient business to justify the construction and maintenance of the same; and shall furnish cars for the movement of such traffic to the best of its ability without discrimination in favor of or

against any such shipper. If any common carrier shall fail to install and operate any such switch or connection as aforesaid, on application therefor in writing by any shipper or owner of such lateral, branch line railroad, such shipper or owner of such lateral, branch line of railroad may make complaint to the Commission, as provided in section 13 of this title, and the Commission shall hear and investigate the same and shall determine as to the safety and practicability thereof and justification and reasonable compensation therefor, and the Commission may make an order, as provided in section 15 of this title, directing the common carrier to comply with the provisions of this section in accordance with such order, and such order shall be enforced as hereinafter provided for the enforcement of all other orders by the Commission, other than orders for the payment of money."

*ment of a railroad. They deal primarily with rights sought to be exercised by the carrier.* Compare Railroad Commission [of State of Cal.] v. Southern Pacific Co., 264 U.S. 331, 345 [44 S.Ct. 376, 68 L.Ed. 713]; Texas & Pacific Ry. Co. v. Gulf, Colorado & Santa Fe Ry. Co., 270 U.S. 266 [46 S.Ct. 263, 70 L.Ed. 578]; Alabama & Vicksburg Ry. Co. v. Jackson & Eastern Ry. Co., 271 U.S. 244, 249 [46 S.Ct. 535, 70 L.Ed. 928]. In denying their application to side tracks or spurs, paragraph 22 refers to tracks built by the carrier as a part of its railroad. Compare Swift & Co. v. Hocking Valley Ry. Co., 243 U.S. 281, 285, 290 [37 S.Ct. 287, 61 L.Ed. 722]. Paragraph 9, on the other hand, relates to switch connections with private sidings built by the shipper." 275 U.S. at 408, 48 S.Ct. at 191, 72 L.Ed. 338. (Emphasis added.)

The Big Four argued, secondly, that the Commission order under paragraph 9 was void because it failed to comply with the requirements of paragraph 18. The Court stated as follows:

"The contention has two phases. In the first place, it is said that if the switch connection is made, the side track, by enabling the Big Four to reach into territory hitherto served wholly by another carrier, will become an extension of its lines within the meaning of paragraph 18. * * * This argument proceeds from the same misconception of the purpose of paragraphs 18 to 21 as does the argument discussed above. *These paragraphs deal with construction and abandonment on the part of the carrier, not with side tracks built by the shipper. Furthermore the order gave the Big Four no trackage rights over the Coal Company's track. The mere fact that a side track with which a connection is sought extends to an industry located on another railroad does not make the switch connection or the track of the shipper, or both*

*combined, an extension of the railroad within the meaning of paragraphs 18 to 21.*" 275 U.S. at 409, 48 S.Ct. at 192, 72 L.Ed. 338. (Emphasis added.) The second phase of this contention was that because the Illinois Central and the Southern Illinois had the right to use the private track to reach mines on the line of the Big Four (although they had not yet exercised that right), there was an extension of the lines of those railroads without Commission authority. The Court stated, "If the track is used by the Illinois Central or the Southern Illinois in the manner described, paragraph 20 of § 1 furnishes the appellant with an appropriate remedy." Id. 275 U.S. at 410, 48 S.Ct. at 192, 72 L.Ed. 338.

The Cleveland opinion establishes that if Peabody itself transported its coal over its track in its own cars to Boonville, the defendant's service of Peabody could not be regarded as an extension of line under paragraph 18, even though the Lynnville Mine is located on the plaintiff's line. See also Pennsylvania R. R. v. Pittsburgh, L. & W. R. R., 83 F.2d 861 (6th Cir.), cert. denied, 299 U.S. 572, 57 S.Ct. 35, 81 L.Ed. 421 (1936). Indeed, Peabody could compel defendant to install a switch connection at that point in a proceeding under paragraph 9, if the connection, in the words of that paragraph, were "reasonably practicable," could be "put in with safety," and would "furnish sufficient business to justify the construction and maintenance of the same." Note that these three factors are the only ones listed for the Commission to consider in determining whether to order a carrier to construct a switch connection with a private side track under paragraph 9. That another carrier serves the mine already does not excuse the carrier with which a connection is sought from making that connection. Cleveland, C., C. & St. L. Ry. v. United States, 275 U.S. 404, 412–413, 48 S.Ct. 189, 72 L.Ed. 338 (1928).

Subsequent to the Cleveland opinion, the coal company sought and obtained an

order of the Commission compelling the Big Four, which had installed the switch connection involved in the previous litigation, to render service *at the mine.* The coal company alleged, and the Commission found, that the carrier rendered similar service to other mines similarly situated and in competition with it; thus the carrier's refusal to serve this mine in the same manner constituted undue preference and prejudice under section 3 of the Interstate Commerce Act, 49 U.S.C. § 3. In this proceeding, the Commission rejected the contention that because the mine was located on the line of another carrier, the Big Four had no obligation to serve the mine. The Commission further stated:

> "There is a clear distinction between a carrier serving a mine or industry over a private track constructed by the mine or industry to connect with the carrier's rails, and the extension of a carrier's service over a private track, as a bridge line, to reach mines or industries which have in turn built private tracks to connect with the bridge line. The latter is clearly a service for which a certificate would be necessary under section 1(18)." J. K. Dering Coal Co. v. Cleveland, C., C. & St. L. Ry. 206 I.C.C. 661, 666 (1935).

If service at the mine, such as that rendered by defendant to Lynnville, can be compelled by the Commission where refusal to render such service constitutes a section 3 violation, and such service is not regarded as an extension under paragraph 18 in that situation, it would be illogical to hold that such service is an extension under paragraph 18 when rendered voluntarily.

█ The decisions involving the Dering track support the theory that where a carrier serves a mine over private track owned and maintained by the shipper, and does not serve others over that track, the carrier operation is not an extension of line under paragraph 18.

█ The plaintiff contends that these decisions involving the Dering track are inapplicable because no competing carrier, standing to lose business as the result of service of the mine by the Big Four, objected to such service. The plaintiff notes that the factor of carrier competition was crucial in Texas & Pacific and that this factor was not considered in the Dering cases. It seems to me, however, that the factor of carrier competition would not have altered the results in these decisions. It would be difficult to reconcile the language of Mr. Justice Brandeis in the Cleveland opinion, quoted above, with the view that carrier competition would have altered the result. And, for reasons discussed hereinafter, that while the element of carrier competition is logically relevant in deciding whether track to be constructed by a *carrier* is industrial track within the meaning of paragraph 22—the issue in Texas & Pacific—, it is not logically relevant in deciding whether the movement of a carrier's cars over track built, owned, and operated by a *shipper* (exclusively to serve the shipper) is an extension of the carrier's line.

█ Authority of the Commission is required under paragraph 18 for a carrier to operate as a common carrier over private track, i. e., where the carrier holds itself out by tariff or otherwise to serve the public thereover. See Practices Affecting Dillonvale & Smithfield Ry., 229 I.C.C. 687 (1938); Northern Pac. Ry. Operation, 261 I.C.C. 631 (1946); Acquisition of Line by Iberia & Vermilion R. R., 111 I.C.C. 660 (1926).

It would also appear that such authority is required if the carrier, although serving only the owner of the mine or industry involved, undertakes to maintain or assist in maintaining the track over which it operates. This use of the carrier's resources would bring the carrier within the language of paragraph 18 prohibiting it "to operate any line of railroad, or extension thereof," without Commission authorization. This theory would explain, at least in part, the one case which the plaintiff has cited concerning operation of a carrier over private track.

In the first hearing of that case, Wheeling & L. E. Ry. Operation, 261 I.C.C. 37 (1945), the Commission refused to grant a certificate under paragraph 18 authorizing the applicant carrier to serve a single industry over the private track of the industry. The Commission report contains no discussion of jurisdiction; consequently, the case cannot be regarded as holding that the contemplated operation would constitute an extension of line under paragraph 18. The report discusses only those considerations relevant to the question whether the operation was required for public convenience and necessity. It is noteworthy, however, that the carrier, under the proposed plan, would have paid rental to the track owner for use of the track. The payment of such rental would involve the carrier in *operation* of a line, for which Commission authority is required under paragraph 18.

On rehearing, 261 I.C.C. 453 (1945), the Commission granted the authority sought. The plan presented on rehearing eliminated the rental agreement. Although the Commission did not so imply, and apparently the parties did not so urge, it seems logical to say that the projected operation considered on rehearing probably did not constitute an extension of line and no Commission authorization was required therefore.

No case has come to the court's attention in which the mere operation of a carrier over private track to serve the track owner has been considered "operation" of a line of railroad or extension thereof by the carrier. True, it is established in cases involving trackage rights that "There is nothing to suggest that the 'operation' for which the commission's approval is required may not be by other than the owner or lessee of the line or that it is to be limited to exclusive use." Transit Commission v. United States, 289 U.S. 121, 128, 53 S.Ct. 536, 538, 77 L.Ed. 1075 (1933). But these cases typically involve the joint use of track under trackage rights, whereby a carrier engages in common carriage over the track and pays rental for use of the track. Such

use constitutes "operation" within the meaning of paragraph 18. Ibid. That the expenditure of carrier funds is a crucial consideration in determining that "operation" by the carrier is involved was indicated by the Supreme Court in the Transit Commission case, supra, where the Court stated:

"So far as concerns the purpose to be attained by this legislation, there is no room for a distinction between unjustifiable *expenditures* for the construction or operation of new mileage, on the one hand, and *inadequate rentals or extortionate exactions* under trackage agreements, on the other. *The reasons for the exertion of federal authority, to the exclusion of state regulation, apply with like force to both.*" Id. 289 U.S. at 128, 53 S.Ct. at 538, 77 L.Ed. 1075. (Emphasis added.)

That "operation" under paragraph 18 is not achieved without the element of common carriage and/or the expenditure of carrier funds is also indicated by the Commission report in Northern Pac. Ry. Operation, 261 I.C.C. 631 (1946). There, the United States Navy had spent $7,500,000 to construct a railroad line to serve three naval installations. The Navy line connected with the Northern Pacific at Shelton, Washington. The Northern Pacific agreed to operate the Navy railroad as an integral part of its system, provided a certificate of convenience and necessity could be obtained from the Commission. By supplemental agreement, the parties agreed that, pending the granting of a certificate, Northern Pacific would operate the railroad solely for the Navy as a private contract carrier.

Operations commenced under the supplemental agreement, with the understanding that if the application were denied, the Government would reimburse the applicant for expenses incurred in its operation as a private carrier.

The Commission granted the requested certificate, under which the Northern Pacific undertook to conduct a common carrier operation and assumed all op-

perating costs of the line. The Commission noted in its report:

> "If the application herein is granted, *the Navy will save the cost of maintaining and operating the line.* If the application is denied, contract-carrier operations by the Northern Pacific may be continued under the supplemental agreement, *but at the expense of the Navy* in addition to the rates which would apply to points on the line if common-carrier operation by the Northern Pacific is authorized." 261 I.C.C. at 642.

■ I conclude from these decisions that a carrier need not apply for Commission certification under paragraph 18 for operating over private track to serve the track owner, where the carrier does not engage in common carrier service over the track and where the carrier does not use its funds to maintain the track. The plaintiff's theory boils down to the view that the only factor required to make a carrier's operation over private track an extension of line is that another carrier will lose business as the result of the operation. I cannot agree, and the cases do not so hold. The question whether a carrier has invaded or threatens to invade "new territory" already served by another carrier—the carrier competition test enunciated in Texas & Pacific—is appropriate for the court to examine only after it is established that the "invading" carrier proposes to construct or operate, or is operating, some sort of road; the "new territory" question then becomes relevant in determining whether the track is within paragraph 18 or 22. But if the "invading" carrier does not operate as a common carrier over the private track and does not use its funds to maintain the track or for the privilege of operating thereover,

it is not operating any kind of road—branch, extension, spur or other—and does not fall within paragraph 18. The question of carrier competition, in this situation, is never reached.[4]

This result appears to be compelled by both the language of paragraph 18 and the policy of the Interstate Commerce Act. Unless the carrier operating over private track to serve the track owner serves the public over the track or makes some investment of its resources in the track, it is difficult to understand how the carrier could, thereby, "undertake the extension of its line of railroad, or * * * acquire or operate any line of railroad, or extension thereof, or * * * engage in transportation under this chapter over or by means of such additional or extended line of railroad."

■ The principal evil which paragraph 18 was designed to eradicate was the waste of carrier funds through the building or extension of unnecessary lines, which, without any promise of profitable operation, and too often undertaken merely for profit from the sale of securities, became a burden upon the public. See extracts from the legislative history of section 1(18)–(22), in Mac-Veagh, The Transportation Act 1920, pp. 218–24, esp. 219 & 221 (1923). See also Union Pac. R. R. v. Denver & R. G. W. R. R., 198 F.2d 854, 858 (10th Cir. 1952); Chicago, R. I. & Pac. R. R. v. United States, 205 F.Supp. 378 (N.D.Ill.1962). Decisions regarding paragraph 18 have consistently stressed the question whether the expenditure of funds by the carrier would be substantial. Marshall, Railroad Certificates of Convenience and Necessity Issued Under the Interstate Commerce Act, 22 Oregon L.Rev. 215, 250 (1943). See, e. g., State of Georgia v. United States, 156 F.Supp. 711, 717–

---

4. Another way of stating this point is that where a carrier serves a shipper over the latter's private track—or at a switch connection with the private track—the carrier is not invading the territory of another, because the shipper is in fact "located" on the line of the carrier in question. See Cleveland, C., C. & St. L. Ry. v. United States, 275 U.S. 404, 48 S.Ct.

189, 72 L.Ed. 338 (1928). It seems to me more logical, however, to say that the question of invasion is not reached at all where the carrier operation in question does not fall within the terms of paragraph 18. The question arises only when the terms of paragraph 18 apply and the exceptions of paragraph 22 are then invoked.

718 (N.D.Ga.1957), affirmed, 356 U.S. 273, 78 S.Ct. 771, 2 L.Ed.2d 760 (1958); Chicago, M. St. P. & Pac. R. R. v. United States, 214 F.Supp. 244, 248 (E.D.Wis. 1963); Detroit & M. Ry. v. Boyne City, G. & A. R. R., 286 F. 540 (E.D.Mich. 1923).

The legislative history and the decisions also establish that destructive competition among carriers is a weighty consideration. But it seems to me evident from the scheme of the Act that while carrier competition is a most important consideration where the investment of carriers' funds is involved, such competition is not determinative where the investment of shippers' funds is involved. Thus, private construction for private transporation, though it may cause a loss of business to a common carrier, is not subject to the provisions of paragraph 18. Pennsylvania R. R. v. Pittsburgh, L. & W. R. R., 83 F.2d 861, 864 (6th Cir.), cert. denied, 299 U.S. 572, 57 S.Ct. 35, 81 L.Ed. 421 (1936). The Interstate Commerce Act reflects a legislative policy for the protection not only of carriers and their interests, but also of shippers and their interests. At points, these interests inevitably conflict; thus, it appears entirely logical to apply a diversion-of-carrier-business test to determine whether track may be built, owned, or operated by a competing carrier without Commission authorization under section 1(18), but not to apply such a test where the track is built, owned, and operated by a shipper. Clearly, if the competing carrier serves the shipper only at the point of connection of the shipper's and carrier's lines, the carrier has not undertaken an extension of its line. Cleveland, C., C. & St. L. Ry. v. United States, 275 U.S. 404, 48 S.Ct. 189, 72 L. Ed. 338 (1928); Pennsylvania R. R. v. Pittsburgh, L. & W. R. R., 83 F.2d 861 (6th Cir.), cert. denied, 299 U.S. 572, 57 S.Ct. 35, 81 L.Ed. 421 (1936). Indeed, as has been shown above, the shipper can compel the carrier to provide a switch connection at that point under section 1 (9), if certain specified criteria are met, *not* including the criterion of carrier competition or duplication of carrier facilities. It would be ludicrous, and subversive of the policy of the Act toward shippers, to hold that what the shipper can compel under section 1(9), cannot be rendered by the connecting carrier unless the carrier obtains a certificate of convenience and necessity under section 1(18). The concept of convenience and necessity is far broader than the criteria set forth in paragraph 9.

And I perceive no reason for a rule that the carrier, under these conditions, need not obtain a certificate of convenience and necessity to serve the shipper at the point where the switch connection is made, but must do so if it sends its cars for loading or unloading to the mine over track owned and maintained by the shipper. Such service is frequently rendered over private track and is generally regarded as merely incidental to the road-haul service. See, e. g., Detroit & M. Ry. v. Boyne City, G. & A. R. R., 286 F. 540, 547 (E.D.Mich. 1923). Such service, moreover, can be compelled by the shipper where section 3 is applicable, and the carrier need not have Commission authority under paragraph 18 to render the service. J. K. Dering Coal Co. v. Cleveland, C., C. & St. L. Ry., 206 I.C.C. 661 (1935). Similarly such service can be rendered through voluntary agreement between the shipper and carrier without Commission certification.

## THE FACTS IN ISSUE

Having determined that a carrier has not undertaken an extension of line where it operates over private track to serve a shipper, unless the carrier (1) maintains a common carrier service thereover or (2) pays for the use or maintenance of the track, we may now examine the facts in issue, which bear upon whether the defendant falls within points (1) or (2) above.

The plaintiff regards as of great significance the fact that the defendant constructed, in part, the last 5,150 feet of the track in question. The plaintiff notes that the defendant spent $26,381 in constructing this segment in 1958, that

Peabody bought it for $25,000, 4½ years later, and that the sale was made only after the plaintiff brought suit and served interrogatories regarding ownership of the Peabody track. The plaintiff concludes that until this suit was brought, the defendant regarded its investment in the track as adequately justified by the traffic it received from Peabody and did not intend to seek reimbursement. The plaintiff further maintains that the price paid by Peabody for the track in 1963 shows the defendant had regarded the track as an extension of line. The plaintiff asserts that the price was lower than the original cost to the defendant (rather than higher, reflecting the original cost plus interest) either because the price reflected deterioration of the track, showing that the defendant was regarded as the track owner before the sale, or because the price reflected the benefit which the defendant was receiving from Peabody traffic.

The evidence relating to the construction of this segment of track by the defendant does not establish that the defendant has undertaken an extension of line within the meaning of paragraph 18. Peabody requested that the defendant construct the track, Peabody has paid for the track, and Peabody has title to both the track and the right of way over which it runs. The defendant does not pay Peabody for operating over the track and has no trackage rights therein. The building of this segment was private construction by Peabody, the same as if Peabody had contracted with any other builder for the job. Private construction for private transportation is not subject to the provisions of paragraph 18, Pennsylvania R. R. v. Pittsburgh, L. & W. R. R., 83 F.2d 861 (6th Cir.), cert. denied, 299 U.S. 572, 57 S.Ct. 35, 81 L.Ed. 421 (1936), and the plaintiff does not argue to the contrary.

The evidence establishes that Peabody and the defendant contemplated that Peabody would give consideration for the construction of the track by the defendant, other than merely the "consideration" of benefits to the defendant from traffic from the Lynnville Mine. Prior to the construction, the parties to the transaction were considering an exchange of track, whereby, for construction of the new segment by the defendant, Peabody would transfer to defendant certain track, together with an easement on the right-of-way, connecting with the defendant's Sunlight Spur. (Tr., p. 35.) Both during and subsequent to construction of the track by the defendant, Peabody and the defendant carried on negotiations concerning payment for the track and discussed the defendant's operations thereover. (Tr. pp. 36, 64–65, 78; Defendant's exhibits 5, 6, 7, 8, & 9.) Eventually Peabody paid for the track a sum far too high to demonstrate that this was a sham transaction.

The plaintiff suggests that the defendant was attempting to obtain operating rights or trackage rights over the Peabody track in the course of these negotiations. Had the defendant obtained such rights, it might have "undertaken an extension of line" within the meaning of paragraph 18. But even if the defendant desired such rights, the fact is it did not obtain them. I cannot enjoin something that "might have been" had the negotiations come out differently.

Does the price which defendant accepted for the track somehow establish that the defendant has undertaken an extension of line? The plaintiff suggests that the defendant should have received $5,000.50 more than it got, which sum would have reflected the cost of construction plus interest over the 4½ years between construction and payment. Clearly, the defendant lost some money in this transaction. But does this mean that the defendant has made an investment in the track amounting to an extension of line? For two reasons, I must answer no.

First, even if this is an "investment" in the track, the cases show that only a "substantial" expenditure qualifies to make a track expenditure an extension of line. See, e. g., State of Georgia v. United States, 156 F.Supp. 711, 717–718 (N.D.Ga.1957), affirmed, 356 U.S. 273,

78 S.Ct. 771, 2 L.Ed.2d 760 (1958). This expenditure for track, if it can be so regarded, is not substantial. Compare, e. g., New York C. R. R. v. Norfolk & W. Ry., 214 F.Supp. 549 (S.D.W.Va. 1963); Chicago, M., St. P. & Pac. R. R. v. United States, 214 F.Supp. 244 (E.D. Wis.1963).

Second, it appears to me inappropriate to regard the financial loss of the defendant in this transaction as an expenditure of funds for the track. Initially, a cash payment was not the consideration that the defendant hoped to receive. The defendant did finally receive cash consideration for the construction, and the price that Peabody was willing to pay could have reflected any number of considerations unrelated to the initial cost to the defendant. The value of the track to Peabody 4½ years after construction cannot necessarily be measured by the initial cost. The fact that the defendant could not drive a better bargain cannot be held, I think, to make its loss and expenditure for track amounting to an extension of line.

Plaintiff also contends that certain rate proceedings before the Illinois Freight Association establish that the defendant's operations over the Peabody track constitute an extension of line. On August 3, 1962, the defendant filed with the Illinois-Indiana Coal and Coke Committee of that Association a proposal suggesting the establishment of rates on coal from Lynnville to Madison, Wisconsin, for the defendant. The evidence shows, however, that the listing of Lynnville as a point of origin for the defendant was a mistake, and that before any action was taken on the proposal by the committee, the defendant amended it to show the origin as Boonville, the proposed rate to apply on coal originating at Lynnville. The rate suggested in the amended proposal was rejected by the Association and was never put into effect.

This episode does not establish an extension of line. Even if the plaintiff's contention were correct, that the defendant desired tariff rates on Lynnville as a point of origin, the defendant withdrew the proposal and does not publish rates from Lynnville. It does not, therefore, hold itself out by tariff or otherwise as carrying on a common carrier operation from Lynnville. What the defendant might have desired does not alter the facts as they exist.

Finally, the plaintiff has argued that defendant obtained authority from the Interstate Commerce Commission under paragraph 18 for a certain operation over the Yankeetown Dock Corporation track running in a southerly direction from Boonville. The plaintiff apparently considers that because the Yankeetown Dock track, like the Peabody track, is privately owned, the defendant's action in obtaining Commission authority under paragraph 18 for operating over the former establishes that the defendant should have done likewise before operating over the latter.

Most of the evidence regarding the Yankeetown operation was excluded as irrelevant at the trial. It is appropriate to note, however, that the defendant's action in obtaining Commission approval for its operation over the Yankeetown Dock track is entirely consistent with its position in the instant case. In the Commission proceeding, the defendant sought to obtain and did obtain authority to acquire trackage rights, at established monthly rentals, and to operate as a common carrier over the Yankeetown Dock line.

Southern Ry. Operation, Finance Docket No. 19341 (Oct. 12, 1956). In the Lynnville operation, the defendant has no trackage rights, pays no rental, and does not operate as a common carrier.

 Inasmuch as the plaintiff has failed to establish that defendant's operation over the Peabody track to serve the Lynnville Mine is an extension of line within the meaning of section 1(18), the plaintiff's prayer for injunctive relief is denied, and judgment will be entered for the defendant.

This memorandum of decision shall stand as the Court's findings of fact and conclusions of law within the meaning of Rule 52 of the Federal Rules of Civil Procedure.