**CHICAGO & EASTERN ILLINOIS RAIL-ROAD COMPANY, a corporation, Plaintiff,**

**v.**

**ILLINOIS CENTRAL RAILROAD COMPANY, a corporation, Defendant.**

**No. 66 C 1842.**

United States District Court
N. D. Illinois, E. D.

Nov. 17, 1966.

Supplemental Opinion and Ruling on Motions Dec. 16, 1966.

Merrill Shepard, Ellis A. Ballard, W. McNeil Kennedy, Chicago, Ill., Pope, Ballard, Uriell, Shepard, Kennedy &

Fowle, Chicago, Ill., of counsel, for plaintiff.

John Foster, W. J. O'Brien, Lawrence Lawless, Thomas F. McFarland, Jr., Chicago, Ill., Robert Mitten, Chicago, Ill., of counsel, for defendant.

## OPINION AND ORDER

AUSTIN, District Judge.

This is a suit arising under Sections 1(18)[1] and 1(20)[2] of the Interstate Commerce Act, 49 U.S.C. §§ 1(18), 1(20). Both parties are interstate carriers by rail subject to the Act. Jurisdiction of the Court is founded upon 28 U.S.C. § 1337 as a proceeding arising under an Act of Congress regulating commerce, and venue is laid in this District pursuant to 28 U.S.C. § 1391.

In its verified complaint, plaintiff seeks an injunction against the continued construction of, and future operation over, trackage facilities being built by defendant from the terminal point of defendant's trackage at Orient Mine No. 3 in Jefferson County, Illinois, to a mine to be opened by the Inland Steel Company, located some three and one half miles southeast of Orient Mine No. 3, unless and until the defendant shall have obtained from the Interstate Com-

merce Commission a certificate of public convenience and necessity in compliance with 48 U.S.C. § 1(18). (See Appendix.)

Defendant has filed a verified counterclaim in which it seeks to enjoin plaintiff from continuing to operate over trackage built by plaintiff in 1960 extending from the city of Nason, in Jefferson County, to Old Ben Mine No. 21 in Franklin County, Illinois, until such time as plaintiff shall have applied for and received a certificate of public convenience and necessity authorizing the alleged extension as required by 49 U.S.C. § 1(18). The trackage which is the subject of the counterclaim runs in a north-south direction approximately one mile east of the proposed Inland mine. (See Appendix.) Defendant also seeks an accounting of past revenues collected by plaintiff as a result of its operation over the challenged trackage as well as the right to share in any future revenues, all pursuant to rights defendant claims it has as the result of an Agreement between it and plaintiff hereinafter described.

Numerous affidavits have been filed by both parties in support of their respective claims. A hearing was held on October 26, 1966, as to the questions of fact and law raised by both the com-

---

1. 49 U.S.C. § 1(18) provides in pertinent part:

 No carrier by railroad subject to this chapter shall undertake the extension of its line of railroad, or the construction of a new line of railroad, or shall acquire or operate any line of railroad, or extension thereof, or shall engage in transportation under this chapter over or by means of such additional or extended line of railroad, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity require or will require the construction, or operation, or construction and operation, of such additional or extended line of railroad * * *.

2. 49 U.S.C. § 1(20) provides in pertinent part:

 The Commission shall have power to issue such certificate as prayed for, or to refuse to issue it, or to issue it for a

portion or portions of a line of railroad, or extension thereof, described in the application, or for the partial exercise only of such right or privilege, and may attach to the issuance of the certificate such terms and conditions as in its judgment the public convenience and necessity may require. From and after issuance of such certificate, and not before, the carrier by railroad may, without securing approval other than such certificate, comply with the terms and conditions contained in or attached to the issuance of such certificate and proceed with the construction, operation, or abandonment covered thereby. Any construction, operation or abandonment contrary to the provisions of this paragraph or of paragraph (18) or (19) of this section may be enjoined by any court of competent jurisdiction at the suit of the United States, the Commission, any commission or regulating body of the State or States affected, or any party in interest * * *.

plaint and counterclaim. Briefs have been filed by both parties.

The principal question presented by both the complaint and counterclaim is identical, and that is, whether as a matter of law the challenged trackage is an "extension" or "spur" as those terms are used in the Act. This is a mixed question of fact and law which is left by Congress to the decision of a court and not to the final determination of the Commission. United States v. State of Idaho, 298 U.S. 105, 56 S.Ct. 690, 80 L.Ed. 1070 (1936). The question is properly presented here first, rather than before the Commission, because the exclusive remedy of a "party in interest" who may be injured by allegedly unlawful construction of trackage, where no application for a certificate of public convenience and necessity has been made by the constructing carrier, is by way of an injunction. Texas & P. Ry. v. Gulf, C. & S. F. Ry. Co., 270 U.S. 266, 46 S.Ct. 263, 70 L.Ed. 578 (1926).

This dispute arises out of the desire of the two carriers to serve a coal mine to be opened by the Inland Steel Company not far from the trackage of either railroad. The mine is located in the southwest quarter of Jefferson County, Illinois, an area rich in coal fields, which provides a significant source of revenue for the carriers serving the area. For example, the proposed Inland mine is stated by the parties to represent as a source of freight approximately 1.5 to 2.5 million tons of coal per annum for an indefinite number of years in the future.

There are, at this time, four railroads effectively operating in the southwest quarter of Jefferson County, plaintiff (C&EI), defendant (IC), the Missouri Pacific Railroad Company (MP), and the Chicago, Burlington & Quincy Railroad (CB&Q). A fifth railroad, the Jefferson Southwestern Railroad (JSW), is there in name only as it is owned and operated by the plaintiff, defendant, and the MP.

The JSW extends southwesterly from Mt. Vernon to Nason, a distance of 12.84 miles. It was constructed in approximately 1924 by the Jefferson Southwestern Railroad Company, a subsidiary of the Illinois Coal Corporation, to serve about 22,000 acres of land in the southwestern quarter of Jefferson County, and particularly to serve a mine located at Nason. Nason, therefore, is the terminal point of the JSW. Nason is approximately 4.5 miles north of the proposed Inland mine. The JSW connects at Mt. Vernon with a main line of the C&EI. (See Appendix.)

In 1941, the IC and the trustee of the MP obtained authority from the ICC to operate under contract the properties of the JSW. Illinois Central Railroad Company, et al., Operation, 247 I.C.C. 415 (1941). The Commission found that the JSW was granting to the IC and MP "the exclusive right" to use the JSW trackage "for the purpose of * * serving any and all persons located on or near" the JSW trackage and any connecting "service tracks" that might be installed and operated by the IC and MP. The Commission noted that it was more economical to permit the IC to operate over the JSW than to permit it to construct its own lines into the area served by the JSW. The nearest IC main line to Nason was its north-south line approximately 15 miles west. The Commission also noted that "No other railroads are known to be interested in the [JSW]." The JSW was operated continuously by the MP and IC from 1941 until 1952. During those years, all motive power over the JSW was provided exclusively by the MP, although cars of both the MP and IC were used to haul freight. Thus in 1941, the C&EI had no interest of any nature in the JSW.

In 1949, the IC received authority from the Commission to construct an extension of its line running from its north-south main line south of Bois, in Perry County, easterly across the line of the MP to a connection with a spur track of the CB&Q at Orient Mine No. 3, in Jefferson County. The length of

this extension is approximately 9.45 miles. The extension, commonly referred to as the IC's "Bois extension," was constructed after obtaining Commission approval. Illinois Central Railroad Company—Construction, 271 I.C.C. 811 (1949). It is approximately 3.5 miles from the terminal point of the IC extension at Orient Mine No. 3 to the proposed Inland mine. Thus in 1949, the closest IC trackage of its own to the Inland mine was this extension, approximately 3.5 miles away, and the closest C&EI trackage of its own to the Inland mine was its main line running south from Mt. Vernon, approximately 6.5 miles away. (See Appendix.)

In 1952, the C&EI purchased the entire stock of the JSW from the Zeigler Coal Company, which at that time owned the JSW, pursuant to an agreement with Zeigler that it would sell one-third of the stock to each of the two railroads that had been operating the JSW up to that time. Thus in 1952, the C&EI, IC and MP entered into a tri-partite Agreement to own and operate the JSW. The Agreement was approved by the Commission in Jefferson Southwestern Railroad Company, et al., Finance Dockets No. 17602, 17726, and 17727, (1952 and 1954). The Agreement provided, among other things, that any proprietary line had the right to construct an extension, spur or industrial trackage subject to any necessary approval by any regulatory body having jurisdiction, and that either of the other proprietary lines had

the option within six months' notice of completion of any such construction to acquire an equal interest.[3] The Agreement also provided that each of the three proprietary railroads would have trackage rights over the JSW and thus the right to operate under each railroad's own power. Prior to granting of Commission approval, however, the mine at Nason closed, and no carrier has moved coal from the Nason mine after 1952. Thus it was in 1952 that the IC and C&EI first acquired a proprietary interest in the JSW.

In 1960, Old Ben Mine No. 21 opened. It is located in Franklin County approximately 2 miles east of the CB&Q's north-south main line. Franklin County is located directly south of Jefferson County. The first service to the mine was furnished through the construction by the CB&Q of a spur track extending from its north-south main line to the mine. The IC and MP carried freight from the mine over the CB&Q tracks pursuant to a contractual switching agreement with the CB&Q. In September, 1960, the C&EI, pursuant to a request from the owners of Old Ben Mine No. 21, completed construction of trackage, its "Old Ben trackage," southward from the terminus of the JSW at Nason, across the land holdings of Inland, to Old Ben Mine No. 21, a distance of approximately 5.9 miles. It is this segment of trackage that defendant contends by its counterclaim is an "ex-

---

**3.** Article IV of the Agreement provides in part:

Any of the Proprietary Lines may, from time to time, propose to the Board of Directors of Jefferson Southwestern that Jefferson Southwestern construct an extension of its line of railroad or construct any spur track, industrial track, team track, switching track, side track, or other facility to be used in connection with JSW Properties. In the event that the Board of Directors of Jefferson Southwestern shall refuse to authorize and direct such proposed extension, or construction of track or facilities as requested, then the Proprietary Line which proposed such extension or construction, shall have the right thereafter to make such extension or to construct such track

on facilities at its sole expense and use same in conjunction with its use of JSW Properties, subject to the granting of any needed approval by the Interstate Commerce Commission or other regulatory body having jurisdiction; but nothing herein contained shall prevent any Proprietary Line from resisting the granting of such approval. Either of the other Proprietary Lines shall have the right at any time within six (6) months after notice of completion of any such extension, track or facility to join in the ownership and use thereof upon paying its equal share of the cost thereof, and such Proprietary Line shall thereby acquire an equal, undivided interest in such extension, track or facility. * * *

tension" and not a "spur." To construct this trackage, it was necessary for the C&EI to rehabilitate the JSW trackage from Mt. Vernon to Nason which apparently fell into disuse by its three owners when the mine at Nason closed.[4] This trackage lies approximately one mile east of the proposed Inland mine. The C&EI, pursuant to the JSW owners' agreement, notified the IC and MP by telegram on September 13, 1960, that it had completed construction of the trackage from Nason to Old Ben Mine No. 21. Neither the IC nor the MP expressed any desire to acquire an interest in the trackage within the six months time limit provided in the Agreement or at any time thereafter until the IC filed its counterclaim in this action. In August of 1961, the ICC conducted an investigation of the C&EI construction. Under the Act, 49 U.S.C. § 1(20), the Commission has the authority to seek an injunction to restrain operation over trackage constructed in violation of 49 U.S.C. § 1(18). The ICC did not then take, and has not taken to date, any action to enjoin the C&EI from operating over its line from Nason to Old Ben Mine No. 21. When the C&EI began to haul coal from Old Ben Mine No. 21, it first actually served shippers located in the southwestern quarter of Jefferson County. The express purpose of the C&EI in building this trackage was to serve not only Old Ben Mine No. 21 but also any other mines that might be opened along the track.[5] This trackage was built at a cost of approximately $760,000, including the cost of rehabilitating the JSW.[6] Since then, the C&EI alone has expended approximately $240,000 in maintenance and additional improvements.[7] This trackage is unbeset by telephone or telegraph wires, or by freight offices or passenger stations.

On September 9, 1966, defendant began construction of trackage from the terminus of its Bois extension at Orient Mine No. 3 to the proposed Inland mine. That trackage is now substantially completed. This trackage extends 3.5 miles, first easterly across a spur track of the CB&Q extending west to a point at Orient Mine No. 3 where it connects with the Bois extension of the IC, then across the main line of the CB&Q, and then southeasterly to the Inland mine. Trackage east of the CB&Q is newly-constructed trackage.[8] The entire operation was established at a cost of $399,100.[9] This trackage is unbeset by stations or freight offices, or telephone or telegraph services. For the purposes of this suit, this trackage was built solely to serve the Inland mine site. It is this segment of trackage that plaintiff alleges is an "extension" and not a "spur."

The C&EI became aware of the IC construction at least as early as September 20, 1966, when it took pictures of the construction. Suit was filed October 12, 1966. On September 20, 1966, the construction had proceeded to the point of having completed grading operations and applying the necessary fill; preparations were then in progress for subsurfacing and ballasting as well as for the laying of rail and the construction of a bridge; actual ballasting, track laying, and bridge construction had not then been commenced. Plaintiff next observed construction on October 3, 1966, at which time ballasting, bridge construction, and track laying had been commenced. Plaintiff next observed construction on October 11, 1966, at which time more track had been laid. Construction continued rapidly after suit was filed on October 12, 1966. None of these facts is seriously disputed.

4. This is apparent from Exhibits E and H attached to the Affidavit of Patrick C. Mullen.

5. Affidavit of David O. Mathews.

6. Exhibit H attached to the Affidavit of Patrick C. Mullen.

7. Complaint, Paragraph VII.

8. Complaint, Paragraph X; Answer, Paragraph X.

9. Affidavit of John W. Lager.

No case cited by either party, and none unearthed in the Court's own research, dictates that a particular result must follow in this case because of the peculiar geography involved here and because of the unique presence of the Agreement between the parties relating to the JSW. While the segments of trackage challenged by the complaint and the counterclaim each present singular problems, the character of both tracks may nevertheless be determined by applying the same tests to determine whether the trackage is a "spur" or an "extension." In reaching its conclusions, the Court has considered the two segments of challenged trackage independently of their relationship, if any, to each other, or of the relationship of the parties to one another, except insofar as they are parties to a common Agreement, and except for the fact that until the IC built its new trackage, the parties did not genuinely compete in this area.

■ The Court has proceeded in the belief that it must give a liberal or broad construction to the word "extension" and a limited or narrow construction to the word "spur." Chicago, M. St. P. & P. R. Co. v. Northern Pac. R. Co., 120 F.Supp. 710 (W.D.Wash. 1954) and cases cited therein.

■ While there are many factors which should be taken into consideration when determining whether a given segment of trackage is a spur or an extension, see, e. g., Pennsylvania R. Co. v. Reading Co., 132 F.Supp. 616, 621–622 (E.D.Pa. 1955); New York C. R. Co. v. Norfolk & W. Ry. Co., 214 F.Supp. 549, 553 (S.D.W.Va. 1963), one factor, when present, is controlling, whereas all of the others are not. A finding that a given segment of track extends either into territory not tributary to the lines of the carrier or not theretofore served by the carrier, or into territory already being served adequately by another carrier, compels the conclusion that the track is an extension. Texas & P. Ry. v. Gulf, C. & S. F. Ry. Co., supra. As the Court there noted,

But where the proposed trackage extends into territory not theretofore served by the carrier, and particularly when it extends into territory already served by another carrier, its purpose and effect are * * * of national concern. For invasion through new construction of territory adequately served by another carrier * * * may be inimical to the national interest. If the purpose and effect of the new trackage is to extend substantially the line of a carrier into new territory, the proposed trackage constitutes an extension * * * although the line be short, and although the character of the service contemplated be that commonly rendered to industries by means of spurs or industrial tracks. 270 U.S. at 278, 46 S.Ct. at 266.

Although both segments of challenged trackage possess characteristics of spurs, e. g., neither is to provide telephone, telegraph, station, or passenger service, and neither is unusually long, and both were constructed to serve primarily one industry, nevertheless they are both extensions because at the time of their construction, both invaded territory not tributary to the lines of the constructing carrier and not theretofore served in a relevant way by the constructing carrier.

And both invaded territory which was being served by another carrier, and both were constructed at considerable cost. These conclusions were reached not without difficulty because it was necessary to make some determinations as to what kind of "service" to an area is contemplated by the Court's opinion in Texas Pac. Ry. v. Gulf, C. & S. F. Ry. Co., supra, to make territory "tributary to" a carrer's lines. Little authority exists to guide the Court in making these determinations. Because both of the constructing carriers here defend their challenged trackage on the basis that the trackage was built in territory that was both "tributary to" the lines of the carrier and "served" by carrier, it was impossible not to make these determinations. Moreover, it should be noted that this is the first genuinely ad-

verse proceeding involving rail service to the area in question. Since neither party has challenged the standing of the other party to qualify as a "party in interest" as that phrase is used in the Act, the Court assumes, without deciding, that each party is a "party in interest" able to challenge the character of the trackage constructed by the other, if only because each party has a recognizable claim to serve the area in dispute.

## I. The Newly-Constructed IC Trackage from Orient Mine No. 3 to the Inland Mine

Plaintiff asserts that the IC trackage is an "extension" because it invades territory tributary to, and served by, the plaintiff's lines, and that plaintiff is ready, willing and able to, and should be given the first opportunity to, serve shippers in the territory, including the Inland mine. To support its position, plaintiff relies mainly on the fact that the territory is closer to its lines than to defendant's lines. Defendant asserts, however, that the territory is located tributary to, and is already being served by it, and therefore, the trackage is not invading territory tributary to another carrier's lines. Alternatively, defendant asserts that the territory in which it located its track is equally tributary to both its and plaintiff's lines, and therefore, both carriers have a right to build spur tracks into the area. And defendant spends much time pointing out that its track meets the tests for a "spur" track as set forth in *Reading, supra.* Since, however, the Court has determined that the test of invasion into new territory is controlling, it is unnecesary to engage in any extended discussion of the applicability of the *Reading* criteria to defendant's track, or to plaintiff's.

In holding that the IC track is an extension, the Court finds only that it invades territory that is neither tributary to, nor already being served by, the constructing carrier. The Court need not, and for the reasons set forth below does not, accept plaintiff's argument that the territory in which defendant's track has been constructed is tributary to its lines. Nothing in the statute or in *Texas & Pac. Ry., supra,* insists that a challenged construction may be found to be an extension only if it invades territory tributary to the lines of the complaining carrier, although that is the usual situation giving rise to this kind of case. Nor does the Court's holding imply that territory cannot be tributary to more than one carrier. It is well-settled that it can. *See, e. g.,* Missouri, K & T. R. Co. of Texas v. Texas & N. O. R. Co., 172 F.2d 768 (5th Cir. 1949). The territory in question at present is tributary certainly to the main line of the CB&Q and to the plaintiff's Old Ben trackage when, as, and if it receives a certificate from the Commission. The fact that the CB&Q is not here protesting the invasion of territory tributary to its lines does not make that same territory the defendant's or the plaintiff's to serve without first obtaining necessary certificates from the Commission, even though certificates may almost unquestionably be granted to either or both extensions. The CB&Q is not here only because it does not wish to serve the particular mine which prompts these proceedings.

The IC argues first that the territory is tributary to its lines because its "spur" track extends southeasterly only 3.5 miles from the terminal point of its lawfully constructed Bois extension at Orient Mine No. 3 to the mouth of the proposed Inland mine. Of considerable significance, however, is the fact that to extend its track into the territory in which the Inland mine is located, it is necessary for the IC to cross, via an existing CB&Q spur, the north-south main line of the CB&Q. A fair reading of the Commission's opinion authorizing the construction of the IC's Bois extension indicates that the territory the Commission considered tributary to that extension did not encompass the area east of the CB&Q main line. As the Commission noted, the CB&Q stated that the Bois extension of the IC was invading territory tributary to its lines as it was

then proposed, and that it would protest any further invasions into that territory. Illinois Central R. Co.—Construction, 271 I.C.C. 811 (1940). The Commission did not take issue with the CB&Q's contention that the IC Bois extension invaded its territory. Indeed, the determination by the Commission that the Bois to Orient Mine No. 3 trackage of the IC was an extension demonstrated that the Commission accepted the CB&Q's definition of territory tributary to its lines. Certainly the laying of IC trackage east of the CB&Q main line is an invasion of the type the CB&Q reserved the right to protest.

In concluding that the Bois to Orient Mine No. 3 trackage of the IC was an extension, the Commission emphasized that it was necessary for the IC to cross the line of another carrier, the MP, and project its line very near to the line of still another carrier, the CB&Q, to reach Orient Mine No. 3. Thus, here, it is necessary for the IC to cross the line of another carrier, the CB&Q, and project its line very near to the line of another carrier, the C&EI, to reach the Inland mine. This factor supports the conclusion that the IC's newly-constructed trackage is an extension. Admittedly that proceeding before the Commission was not genuinely adverse, and it may be that the Commission was merely stating a fact. However, the only reasonable construction that can be attached to the Commission's opinion is that it considered the fact that the constructing carrier would have to cross the line of another carrier a significant factor arguing in favor of finding that the proposed construction was an extension.

The IC, however, contends that the fact that it is necessary for it to cross the CB&Q main line to reach the Inland mine is insignificant in light of Chicago, M., St. P. & P. R. Co. v. Chicago & E. I. R. Co., 198 F.2d 8 (7th Cir. 1952). While it is true that a segment of track built by the defendant there which crossed the main line of another railroad to reach a plant site located closer to the complaining carrier's main line was held

to be a spur, the findings of the District Court indicate, among other things, that the complaining carrier had declined to serve the plant site, thus abandoning any right to claim the territory as its exclusive territory; that the plant site was contiguous to another site then served by the constructing carrier; that the complaining carrier served no industry south of its main line; that the constructing carrier was first "in the area" by virtue of rights of way purchased prior to the time the complaining carrier entered the area; that the constructing carrier was building the track over grading, though north of the complaining carrier's main line, that it had finished before the complaining carrier entered the area, thus indicating an intention on the part of the constructing carrier to extend its lines south. These and other factors serve to distinguish the case from the instant case since here, the IC was not "in the area" in a way recognizable in this proceeding before either the CB&Q or the plaintiff. This brings the Court to a consideration of the IC's second basis for claiming that the territory is tributary to its lines.

The IC argues that because it is serving Old Ben Mine No. 21 over the lines of the CB&Q by virtue of a contractual switching arrangement with the CB&Q, it is "serving" the area east of the CB&Q main line in such a manner that it may claim the territory for itself, at least in the absence of a claim to the area by the CB&Q. The Court cannot agree. The fact that the IC may have its cars running over the CB&Q main line does not make territory east of that line "tributary to" lines of the IC or territory "served" by the IC. Territory is not "tributary to" a carrier unless it is territory adjacent to the main lines of carrier, i. e., lines which it owns entirely or at least in part. And a carrier does not "serve" an area in the manner here relevant unless it is actually serving shippers in the area over its own lines, or over lines in which it has a proprietary interest and the right to employ its own motive power. State of Georgia v.

United States, 156 F.Supp. 711 (D.C.Ga. 1959), *aff'd per curiam*, 356 U.S. 273, 78 S.Ct. 771, 2 L.Ed.2d 760 (1958); Texas & Pac. Ry. Co. v. Gulf, C. & S. F. Ry. Co., *supra*. And even though the arrangement between the IC and the CB&Q reached by agreement in 1960 is not precisely the same as the reciprocal switching arrangement before the Court in *State of Georgia* that was held not to constitute service to the area there in question, it is a difference without a distinction because if the argument of the IC were accepted, it would mean that a railroad, wherever located, could claim a preemptive right to any territory, wherever located, served by lines of carriers with which the railroad has some kind of arrangement to provide transportation for its cars. Thus a "piggy-back" switching or haulage contract by one carrier with another in a given area does not constitute "serving" the area in such a manner as to permit the carrier whose cars are being hauled to claim a pre-emptive right to the territory served by the main lines of the hauling carrier. None of the cases cited by the parties, and none revealed by the Court's research, have held that a territory is served by a carrier unless it is served by the carrier's own main lines.

Defendant relies heavily upon Missouri, K. & T. R. Co. v. Texas & N. O. R. Co., 172 F.2d 768 (5th Cir. 1949) and upon New York Cent. R. Co. v. Chicago & E. I. R. Co., 222 F.2d 828 (7th Cir. 1955). In both cases, however, unlike here, the constructing carrier's "spur" was built directly from the carrier's main line, employing no other carrier's trackage, into territory bounded by the carrier's main line. Here, the challenged IC trackage lies in an area bounded by a main line not of the IC but the CB&Q and by a segment of plaintiff's main line, its Old Ben trackage, should that trackage be certified. Neither is United States v. State of Idaho, 298 U.S. 105, 56 S.Ct. 690, 80 L.Ed. 1070 (1936), controlling. There, the peculiarly local nature of the track built at the expense

of local shippers was the determining factor. No such factor is present here.

The only other manner in which the IC might claim that the Inland mine location is in territory tributary to its lines is by virtue of its proprietary interest in the JSW, acquired in 1952. There, however, it stands on no better footing than the C&EI since both acquired a proprietary interest in, and the right to employ in conjunction with that interest their own motive power over, the JSW at roughly the same time. Moreover, the IC, since acquiring its proprietary interest, has never actually operated over the JSW; thus it has not served the area by virtue of any interest in or operation over the JSW trackage. Georgia R., et al., Construction and Operation, 320 ICC 25 (1963). Were the IC attempting to serve the area, and the Inland mine in particular, by virtue of its interest in the JSW, it might stand on firmer ground. Since, no doubt, the IC would have to share the revenues with the C&EI and MP by virtue of the agreement among them, and because of switching difficulties at the north end of the JSW, the IC has avoided serving the area via its interest in the JSW and instead is attempting to serve the area by extending its Bois extension into territory not tributary to the Bois extension, regardless of the short distance here involved. While this may be the most efficient and prosperous way for the IC to reach the area and the Inland mine, it is nevertheless an unlawful extension and must be enjoined. Ample authority to support this conclusion may also be found in Chicago, R. I. & P. R. Co. v. Chicago & N. W. Ry. Co., 188 F.Supp. 549 (S.D.Ill.1960); Union P. R. Co. v. Denver & R. G. Western R. Co., 198 F.2d 854 (10th Cir. 1952); New York C. R. Co. v. Norfolk & W. Ry. Co., 214 F.Supp. 549 (S.D.W.Va.1963).

Defendant has submitted evidence by way of affidavit that Inland desires the IC to serve the mine, and that its needs are urgent. That evidence goes not to the question of whether the trackage is an extension or spur but rath-

er to the question of whether the public convenience and necessity would require that defendant enter the area. The evaluation of that evidence Congress has left not to the Court but to the Commission. Chicago, R. I. & P. R. Co. v. Chicago & N. W. Ry. Co., *supra*; New York C. R. Co. v. Norfolk & W. Ry. Co., *supra*; Missouri, K. & T. R. v. Texas & N. O. R. Co., *supra*.

 Defendant asserts that plaintiff is guilty of laches and is harassing defendant. The Court holds that plaintiff is neither burdened with laches nor harassing defendant. When defendant built its track with unusual speed, it did so at its peril. Texas & Pac. Ry. Co. v. Gulf, C. & S. F. Ry. Co., *supra*. Indeed, defendant continued building its line apace after plaintiff filed suit. Defendant does not state that had plaintiff earlier filed suit, it would have ceased building its extension. It is doubtful in light of all the facts that defendant would have ceased its construction efforts at any time before the track was completed unless constrained to do so by court order. Indeed, defendant makes much of the fact that "the only existing track from which rail service can be made directly at the mine site is the track of the Illinois Central." [10] Though that may be true, and though the needs of the shipper may be urgent, though not so urgent as defendant would have the Court believe in light of the C&EI's uncontested observation that it can build a track to the mine site within two weeks time, the track is nevertheless an unlawful extension of defendant's line. Moreover, plaintiff, by virtue of its claim to the territory, has demonstrated that it may suffer irreparable injury should an injunction fail to issue. Therefore, an injunction shall issue restraining defendant from taking such further steps, if any, necessary to complete the construction of its extension to the Inland mine site, and restraining defendant from all operation of any kind over the extension unless and until defendant procures the necessary certificate from the Commission.

## II. The Old Ben Trackage of the C&EI.

As previously noted, the C&EI acquired a proprietary interest in the JSW in 1952. Shortly before the order of the Commission approving tri-partite ownership and operation of the JSW was entered, the mine at Nason closed, and none of the three owners of the JSW moved any traffic over the JSW in the years 1952 to 1960. In 1960, at the request of the proprietors of Old Ben Mine No. 21, the C&EI built a track from Nason southward to the mine site; this is the C&EI's "Old Ben trackage." To provide adequate service to the mine, it was necessary for the C&EI to rehabilitate the line of the JSW from Nason to Mt. Vernon where it connects with a main line of the C&EI.

 The new construction of the C&EI extended from the terminal point of the JSW into territory that was not only tributary to the lines of another carrier, the CB&Q, but also to a point actually served by that carrier's own lines at Old Ben Mine No. 21. The fact that plaintiff's construction extended from lines in which it had a proprietary interest, and in effect, therefore, from its own lines, is not enough to permit the construction to stand as a spur rather than as an extension because the construction extended into an area not theretofore served by the C&EI. Prior to this construction, the C&EI had hauled no freight from the area; hence it had not served the area. The Old Ben trackage of the C&EI, therefore, is a substantial extension of its lines into territory not theretofore served by the C&EI as well as into territory not tributary to its lines. Texas & Pac. Ry. Co. v. Gulf, C. & S. F. Ry. Co., *supra*; Georgia R. et al.—Construction and Operation, supra. Indeed, there is evidence to suggest that the C&EI considered the possibility that the construction might

---

10. Brief for defendant, P. 11.

be an extension, and steps were taken to dispel that impression.[11]

The C&EI claims that the territory in which the Inland mine is located is tributary to its lines by virtue of the location of its Old Ben trackage. Because that trackage is an unlawful extension, plaintiff cannot profit from its existence by claiming the primary right to serve territory adjacent to it unless and until plaintiff receives a certificate from the Commission authorizing plaintiff's extension. Nor may plaintiff derive benefit from the existence of its unlawful extension by constructing any new track to be used in conjunction with the extension to serve shippers located in the area adjacent to the extension. If that were not true, other carriers with claims to serve the area based upon the existence of lawful trackage may suffer irreparable injury in the form of lost freight revenues as well as the loss of the primary right to serve the area. For this reason, the Court will enjoin plaintiff from any such construction.

The Court will not, however, enjoin plaintiff's Nason to Old Ben Mine No. 21 operation for the reason that the IC has not shown that it will suffer irreparable injury if that operation is left undisturbed. The IC is not now entitled to participate in either past or future operation over plaintiff's Old Ben trackage both by virtue of the plain meaning of the Agreement between the parties relating to that construction and by its conduct over the past six years since the trackage was completed. It is clear under the Agreement that the IC had six months following the date on which physical construction of the trackage was completed within which to exercise its right to purchase an interest in the trackage. Regardless of the reasons that motivated the IC not to exercise that right, it may not now demand the opportunity to do so. Plaintiff's Old Ben trackage belongs solely to it. Since the IC has no right to any interest in

plaintiff's Nason to Old Ben Mine No. 21 operation, it cannot suffer irreparable injury if that operation is not enjoined. If the public interest demands that the C&EI's operations from Nason to Old Ben Mine No. 21 be enjoined, the statute vests protection of that interest in the Commission.

The IC seeks to avoid the obvious meaning of the Agreement by asserting that the absence of necessary Commission approval precluded the running of the six months time limit specified in the Agreement. The IC relies upon the presence in Article IV of the Agreement of the phrase "subject to the granting of any needed approval" by the Commission. The entire content of Article IV makes it clear that the phrase cannot bear the meaning ascribed to it by the IC. Its presence in Article IV of the Agreement indicates that extensions, which require Commission approval, were one type of construction that might be undertaken by a proprietary carrier, and that the other proprietary carriers had the right to resist in formal proceedings the granting of any such approval, as in fact subsequent language in Article IV so provides. To attach any greater significance to the phrase is to defeat the intention of the parties that the status of trackage constructed pursuant to the Agreement be settled within a short period of time following the completion of actual construction, and to permit to occur what the IC contends for here, and that is, an unraveling of six years of established operation. That is neither what the parties intended nor what this Court will permit to happen.

Whereas there is an absence of disputed facts,

It is ordered that defendant is permanently enjoined from taking such steps as may be necessary to complete construction of the extension of its trackage from Orient Mine No. 3 to the Inland mine site and from all operation thereon unless and until it receives a

---

11. Exhibits C, D, E, and F attached to the Affidavit of Patrick C. Mullen.

certificate of public convenience and necessity authorizing such extension from the Interstate Commerce Commission.

It is further ordered that plaintiff is permanently enjoined from constructing any trackage to any site in the territory if such trackage is to be used in conjunction with its trackage extending from Nason to Old Ben Mine No. 21 unless and until it receives a certificate of public convenience and necessity from the Interstate Commerce Commission authorizing its extension of line from Nason to Old Ben Mine No. 21. The remainder of defendant's counterclaim is dismissed.

## APPENDIX

KEY
1. Nason
2. Inland Mine Site
3. Old Ben Mine No. 21
4. Orient Mine No. 3
5. Bois

"Bois Extension" of the IC

"Old Ben trackage" of the C & EI

IC trackage to Inland mine site

JSW Main Line

MP Main Line

## SUPPLEMENTAL OPINION

Pursuant to Rule 60(b) [1] of the Federal Rules of Civil Procedure, plaintiff asks this Court to amend its judgment entered on November 17, 1966, to delete from the judgment order that portion of it which permanently enjoins plaintiff from constructing trackage to any site if that trackage is to be used in conjunction with its trackage extending from Nason to Old Ben Mine No. 21 in Jefferson and Franklin Counties, Illinois, unless and until it receives a certificate of public convenience and necessity from the Interstate Commerce Commission authorizing the extension, and by substituting therefor an order dismissing defendant's counter-claim. In addition, plaintiff seeks an express finding that plaintiff is a party in interest within the meaning of Section 1(20) of the Interstate Commerce Act. Defendant requests a similar finding as to it.

■ The principal effect of plaintiff's Rule 60(b) motion is to ask this Court to reverse its prior determination that the trackage of plaintiff in question is an extension. There is doubt whether a redetermination of issues may be sought properly by a motion pursuant to Rule 60(b) where, but for the presence of the special circumstances required by Rule 60(b) for its application, such a redetermination is more appropriately sought by a motion pursuant to Rule 52 or Rule 59 of the Federal Rules of Civil Procedure. Nugent v. Yellow Cab Co., 295 F.2d 794 (7th Cir. 1961); Hulson v. Atchison, T. & S. F. Ry. Co., 289 F.2d 726 (7th Cir. 1961). Rule 60(b) is not intended to serve as a mechanism for correcting alleged error on the part of the District Court, especially where, as here, time for prosecuting an appeal has not yet expired. Hartman v. Lauchli, 304 F.2d 431 (8th Cir. 1962); Wagner v. United States, 316 F.2d 871 (2nd Cir. 1963). Although there is sufficient authority for denying plaintiff's motion without reaching the merits of the issues raised by it, the Court is of the opinion that the interests of justice would be served more effectively by exercising the discretion permitted to it by Rule 60(b)(6) in such a manner as to consider plaintiff's motion on the merits.

■ Plaintiff insists that a final determination of the issue of whether its challenged trackage is a spur or an extension cannot be made properly without considering the effect on this issue of the affidavit and documents attached to it filed in support of plaintiff's motion. Because plaintiff failed to adduce this additional evidence at the time of this Court's earlier deliberations solely because the evidence was in the process of preparation for presentation at the expected second hearing on permanent relief, which hearing was deemed unnecessary by the Court in light of the evidence presented, see Standard Oil Co. of Texas v. Lopeno Gas Co., 240 F.2d 504 (5th Cir. 1957), and Brotherhood of Railroad Carmen, etc. v. Chicago & N. W. Ry. Co., 354 F.2d 786 (8th Cir. 1965), and because the Court wishes to consider all relevant evidence, there is sufficient reason to invoke the application of Rule 60(b) in the circumstances of this case. Sternstein v. "Italia"—Societa Per Azioni, 275 F.2d 502 (2nd Cir. 1960).

■ Plaintiff urges that this Court's determination that the plaintiff's Old Ben trackage was an extension is erroneous principally because the construction of that trackage was authorized by the Commission in earlier proceedings relating to the Jefferson Southwestern Railroad. Plaintiff relies primarily upon the Commission's opinion in Finance Docket No. 17602, Jefferson Southwestern Railroad Company, et al., Control (1952). During the course of its opinion, the Commission,

---

1. Rule 60(b) provides in pertinent part:
 On motion and upon such terms as are just, the court may relieve a party * * * from a final judgment, order, or proceeding for the following reasons:

 (1) mistake, inadvertence, surprise, or excusable neglect; * * * (6) any other reason justifying relief from the operation of the judgment.

in discussing the possibilities for service for the JSW, noted that "[I]t is understood that the opening of another mine is now being considered by the Old Ben Coal Corporation." It is not seriously disputed that the mine to which the Commission referred was in fact Old Ben Mine No. 21 to which plaintiff ultimately extended its trackage. From this language, plaintiff would have the Court conclude that the Commission authorized construction of 5.9 miles of trackage at a cost of approximately $760,000,[2] which construction was in fact undertaken some eight years after the Commission issued the opinion upon which plaintiff relies. While the Commission clearly indicated that short spurs may and should be built from the JSW trackage, the Commission did not authorize by its oblique reference to an indefinitely and imprecisely proposed coal mine the construction of a segment of trackage which constitutes, as a matter of fact and law, a costly extension. Indeed, in that same opinion, the Commission noted later that "areas in Jefferson and *northern Franklin* Counties * * * could be served * * * through the existing line of the Jefferson Southwestern or *extensions* thereof." (Emphasis supplied). This language, if nothing more, removes the aura of certainty about the implied authorization for its construction that plaintiff says surrounds the Commission's earlier tangential reference to Old Ben Mine No. 21 in the same opinion. Indeed, it may indicate that the Commission was of the opinion that any construction which would extend the JSW into northern Franklin County would be an extension. Plaintiff argues that the Commission did not employ the term "extensions" as a term of art but rather intended the term to include any additional service to the area by the proprietors of the JSW. Regardless of how the Commission's use of the term "extensions" be construed, plaintiff's Old Ben trackage is an extension

when considered in light of its length, its cost, the location of the mine site, the history of actual prior service to the area by the CB&Q, among other factors. Moreover, the final determination of the character of trackage is for this Court to make, United States v. State of Idaho, 298 U.S. 105, 56 S.Ct. 690, 80 L.Ed. 1070 (1936), and that determination was and is that plaintiff's Old Ben trackage is an extension.

◼ Plaintiff contends in addition that the authority it received under Section 5(2) of the Interstate Commerce Act to acquire joint control of the JSW was sufficient authority to extend its trackage to Old Ben Mine No. 21. With this argument, the Court cannot agree. Assuming *arguendo* that plaintiff's argument has some merit, the case plaintiff cites in support of it, Rock Island System Consolidation, 193 I.C.C. 395 (1933), is clearly distinguishable. There, unlike here, the Commission had before it a precise application for an extension of operations contemplated by the carriers involved in that proceeding. Presumably by virtue of the application papers, the Commission knew the character and effect of the proposed extension. It does not appear here that in 1952 the Commission was aware of the precise nature of the construction of trackage by the plaintiff from Nason to Old Ben Mine No. 21. The result of plaintiff's Section 5(2) proceeding was to make the C&EI equivalent to the JSW for the purpose of providing additional service to the area by the construction of spurs, not extensions. The result reached here would be no different had the JSW and not the C&EI built the trackage to Old Ben Mine No. 21. Thus the question of the character of plaintiff's Old Ben trackage has never been presented to the Commission.

◼ Plaintiff has introduced an additional affidavit and some documents

---

2. On argument, plaintiff points out that much of this cost was incurred in the rehabilitation of the JSW. Without that rehabilitation, however, plaintiff's Old Ben extension would be useless. For that reason, it is proper to include the cost of rehabilitating the JSW in determining the total cost of the challenged trackage. Georgia R. et al.—Construction and Operation, 320 I.C.C. 25 (1963).

which indicate only that plaintiff has long entertained a desire to serve Old Ben Mine No. 21, and that as early as 1948–1949, plaintiff contemplated serving the mine wherever it might be located. These documents, however, do nothing more than demonstrate plaintiff's interest in serving the mine site. They do not make that site tributary to the line of JSW (C&EI). If it was necessary to build an extension to reach that site, then appropriate authority from the Commission as required by the Act must be obtained if plaintiff is to use that extension as the basis for asserting its right to serve the territory adjacent to it. Development of plaintiff's service to the area must be undertaken in accord with the procedures established by the Interstate Commerce Act. Those procedures insist that the Commission first be given the opportunity to determine whether the public convenience and necessity dictate the extension of a carrier's lines, even though that extension may be manifestly beneficial to the area involved. The reason that this Court failed to enjoin all operation over plaintiff's Old Ben trackage is that the record failed to disclose any likelihood of irreparable injury to the parties or the public if plaintiff were permitted to continue its runs from Nason to Old Ben Mine No. 21, and the equity running in favor of plaintiff in six years of undisturbed user of the Old Ben trackage also dictated that that aspect of plaintiff's use of its Old Ben trackage not be enjoined. Plaintiff may not, however, in an equity court expect to derive new benefits from unlawfully constructed trackage. For that reason, this Court enjoined plaintiff from building spurs to be used in conjunction with its unlawful extension. A court of equity is not limited by the precise demands of the pleadings, especially where the pleadings contain prayers for such other relief as this Court may deem just and appropriate.

██. Both parties request that the Court make a specific finding that each of them is a party in interest within the meaning of Section 1(20) of the Act.

This the Court will do, and its opinion filed November 17, 1966 is hereby modified to include findings that plaintiff and defendant are each a party in interest within the meaning of Section 1(20) of the Act. Such other relief as requested by plaintiff is denied.

### RULING ON MOTIONS

Plaintiff has moved this Court to enter an order citing defendant for contempt of the injunction issued against defendant on November 17, 1966, permanently restraining it from any and all operation over its extension of trackage from Orient Mine No. 3 in Jefferson County, Illinois, to the site of a new mine to be opened by Inland Steel Company until that extension is certified by the Interstate Commerce Commission. Defendant has moved this Court pursuant to Rule 60(b) (5) to enter an order lifting the injunction for the reason that defendant claims it has complied with the order of this Court by obtaining from the Safety and Service Board of the Commission a "Car Service" order which authorizes the defendant to operate over its extension to the Inland mine site pending final determination by the Commission on defendant's application for a certificate of public convenience and necessity authorizing the construction to the Inland mine site. The order of the Safety and Service Board, defendant says, is equivalent to a "temporary certificate of public convenience and necessity."

██ For the reason that there is no evidence before the Court that defendant has yet performed any acts which would violate the terms of this Court's injunction, plaintiff's motion to hold defendant in contempt is denied at this time with leave to file a subsequent motion at such time as it becomes evident that defendant has violated the terms of the injunction.

██ Necessarily the motion of defendant to dissolve the injunction heretofore issued against it is likewise denied. While it is clear that this Court is without

jurisdiction to determine the validity of the Service order, United States v. Southern Railway Co., 364 F.2d 86 (5th Cir. 1966), a determination of its validity is unnecessary to resolution of the real question before the Court, and that is, whether the service order is a temporary certificate of public convenience and necessity. Clearly this Court has jurisdiction to determine whether the conditions set forth in its injunctive order have been met.

This is a question of first impression. The parties have not cited any cases, and in the short time available to it, the Court has found none in the Commission or in the Courts in which this question has been presented. Nor apparently has the Safety and Service Board ever before entered a service order in circumstances such as these where an application for a certificate of public convenience and necessity is pending and where there is an outstanding District Court injunction prohibiting the activity purportedly authorized by the service order. Proceeding upon the assumption that the order is valid, the Court holds that it is not a temporary certificate of public convenience and necessity. The sections of the Interstate Commerce Act which deal with certificates of public convenience and necessity, 49 U.S.C. 1(18–20), of primary importance here, do not provide for "temporary" certificates. Indeed, Section 1 (20) of the Act specifically states that "not before" a certificate has been issued shall a carrier conduct operations over a segment of trackage that constitutes an extension. Though factually inapposite, the case of United States v. Rock Island Motor Transit Co., 340 U.S. 419, 71 S.Ct. 382, 95 L.Ed. 391 (1951), is helpful here. There, the Court points out that a certificate of public convenience and necessity "is the final act or order that validates the operation." 340 U.S. at 448, 71 S.Ct. at 398. Thus defendant's appellation of the service order as a "temporary certificate of public convenience and necessity" validating operation cannot be correct. Until the certificate contemplated by Section 1(20) of the Act has been issued to defendant here, its operations have not been sanctioned in accord with this Court's order.

For the reasons set forth above, the motion of plaintiff to cite defendant for contempt and the motion of defendant to dissolve the injunction entered against it are both denied.