**CHICAGO GREAT WESTERN RAILWAY COMPANY, a Corporation, Plaintiff,**

**v.**

**ILLINOIS CENTRAL RAILROAD COMPANY, a Corporation, Defendant.**

**Fort Dodge, Des Moines & Southern Railway Company, Plaintiff-Intervenor.**

**Civ. No. 67–C–2022–C.**

United States District Court
N. D. Iowa,
Central Division.
Nov. 8, 1967.

Hubert C. Jones, Des Moines, Iowa, E. J. Kenny, Chicago, Ill., for plaintiff.

John H. Doeringer, Chicago, Ill., Don N. Kersten and David A. Opheim, Fort Dodge, Iowa, for defendant.

Frank W. Davis, Des Moines, Iowa, for plaintiff-intervenor.

## MEMORANDUM AND ORDER

HANSON, District Judge.

This action was instituted under the Interstate Commerce Act by the Chicago Great Western Railway Company to enjoin the Illinois Central Railroad Company from constructing certain railroad trackage to the plant of the Celotex Corporation near Fort Dodge, Iowa. On October 12, 1967, this Court issued a Temporary Restraining Order enjoining the defendant from further construction. On the same day, the Fort Dodge, Des Moines & Southern Railway Company petitioned the Court to intervene as a party plaintiff. The petition was granted on October 12, 1967. On October 18, 1967, a final hearing was held upon the question of whether or not a permanent injunction should be granted against the completion of the disputed line.

A single issue is decisive of the propriety of permanent injunctive relief: Whether the track in question constitutes an extension under 49 U.S.C., Section 1(18) or a spur or industrial track under Section 1(22).

The basic facts of the case at hand are clear and are primarily undisputed. The proposed track is to be located in the "area of Gypsum" approximately four miles east of Fort Dodge. It would originate at a point on an Illinois Central main line and extend for a distance of 3,888 feet to the Celotex Corporation plant. Approximately 3,308 feet of the line would be on Celotex property. The main line runs in an easterly direction adjacent to the southern boundary of the Celotex Corporation property and the proposed line would angle northward until it connected with a side track owned by Celotex. The cost of the facility is estimated to be $53,334.00. Ninety pound used rails are to be utilized in the project. A switch engine currently operating in the area would be assigned to serve the Celotex plant. No special financing or condemnation proceedings will be required for its completion.

The Great Western tracks run in an easterly direction to the north side of the Celotex plant, roughly parallel to the Illinois Central main line. The Great Western has various facilities at the plant, including two tracks and storage and stub tracks. It had a line south of the plant between that line and the main line of Illinois Central but abandoned it twenty years ago.

The Celotex Corporation owns 480 acres of property and leases an additional 200 acres. The property has a great deal of gypsum bearing ore. The only other industry on the Celotex land is a Northern Propane Company building south of the Celotex plant. It has not been served by any carrier. The proposed track will deviate slightly from its course in order to avoid the Northern Propane plant. Although there was testimony to the effect that the area east of the Celotex plant would be a desirable industrial area subsequent to mining and rehabilitation, the Division Engineer for defendant unequivocally stated that the track would serve only one shipper. Also, the General Traffic Manager for Celotex stated that Celotex has no plans to sell any of the property.

The Illinois Central previously served the Wassem Plaster Company, the predecessor of the Celotex Corporation. Transportation services to the Wassem industry were begun in 1912 by the Illinois Central and the trackage was connected to the main line in question. The now abandoned Wassem plant is located about 1800 feet to the southwest of the present Celotex plant on the same property. The Illinois Central still uses the two tracks in that span for car storage. The Great Western did not carry freight for Wassem but the Fort Dodge, Des Moines & Southern had tracks leading into the Wassem plant from the northwest.

In 1950, the Wassem Company sold its property to the Celotex Corporation. The Illinois Central continued to fulfill the needs of Celotex until 1958 when the new plant was completed. The operation was moved because of the availability of ore. The Great Western and the Fort Dodge, Des Moines & Southern took over such services in the same year. At the present time, the Illinois Central hauls for National Gypsum Company and the Bestwall Gypsum Company which are from three-fourths to one mile from the Celotex plant. It also ships for numerous other industries in Fort Dodge proper. In the future, the Illinois Central will provide direct line service to United States Gypsum Company whose property lies west of that controlled by Celotex.

The Illinois Central indirectly hauls cars from the Celotex plant after a double switch operation by the Great Western and the Fort Dodge, Des Moines & Southern. In 1966, the Illinois Central handled about 500 cars from the Celotex plant and billed a little over five million dollars under Illinois Central bills of lading. The Illinois Central pays about $18.00 in switching charges to the plaintiffs for each car.

If the contemplated track were completed, it is envisioned that the Illinois Central would gain an additional 500 cars a year from the Celotex operation. Part of this increase would derive from cars which are now hauled by other railroads

but which could be conveyed more efficiently by the Illinois Central. The railroads which handle outbound cars from Celotex are the Illinois Central, the Great Western, the Fort Dodge, Des Moines & Southern, and the Chicago Northwestern. There is as much as a twenty-four hour delay in the double switch method and it is not able to effectively reach markets that it could competitively serve with a direct line provided by Illinois Central. Buyers of their product desire fast shipment. Celotex has at times been forced to use the trucking industry at a higher cost due to these obstacles. It has requested the Illinois Central to construct the rail facilities. The Celotex plant would continue to patronize the Great Western and the Fort Dodge, Des Moines & Southern as they serve other markets which Celotex supplies.

Turning to the legal principles governing this case, Section 1(18) provides as follows:

"No carrier by railroad subject to this chapter shall undertake the extension of its line of railroad, or the construction of a new line of railroad, or shall acquire or operate any line of railroad, or extension thereof, or shall engage in transportation under this chapter over or by means of such additional or extended line of railroad, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity require or will require the construction, or operation, or construction and operation, of such additional or extended line of railroad, and no carrier by railroad subject to this chapter shall abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity permit of such abandonment. Nothing in this paragraph or in section 5 of this title shall be considered to prohibit the making of contracts between carriers by railroad subject to this chapter, without the approval of the Commission, for the joint ownership or joint use of spur, industrial, team, switching, or side tracks."

Section 1(22) provides in part that:

"The authority of the Commission conferred by paragraphs (18) to (21) of this section, both inclusive, shall not extend to the construction or abandonment of spur, industrial, team, switching, or side tracks, located or to be located wholly within one State, or of street, suburban, or interurban electric railways, which are not operated as a part or parts of a general steam railroad system of transportation."

Although factually distinguishable, all parties concur in the judgment that the Supreme Court case of Texas & Pacific Railway Company v. Gulf, Colorado & Santa Fe Railway Company, 270 U.S. 266, 46, S.Ct. 263, 70 L.Ed. 578 (1926) is the leading case in the area. The Supreme Court, in holding a Gulf project to be an extension, enunciated the underlying policies of Section 1(18) and (20), on pp. 278–279, 46 S.Ct. on p. 266, by stating that:

"When the clauses in paragraphs 18 to 22 are read in the light of this congressional policy, the meaning and scope of the terms 'extension' and 'industrial track' become clear. The carrier was authorized by Congress to construct, without authority from the Commission, 'spur, industrial, team, switching or side tracks * * * to be located wholly within one state.' Tracks of that character are commonly constructed either to improve the facilities required by shippers already served by the carrier or to supply the facilities to others, who being within the same territory and similarly situated are entitled to like service from the carrier. The question whether the construction should be allowed or compelled depends largely upon local conditions, which the state regulating body is peculiarly fitted to appreciate. Moreover, the expenditure involved is ordinarily small. But where the proposed trackage extends into territory

not theretofore served by the carrier, and particularly where it extends into territory already served by another carrier, its purpose and effect are, under the new policy of Congress, of national concern. For invasion through new construction of territory adequately served by another carrier, like the establishment of excessively low rates in order to secure traffic enjoyed by another, may be inimical to the national interest. If the purpose and effect of the new trackage is to extend substantially the line of a carrier into new territory, the proposed trackage constitutes an extension of the railroad, within the meaning of paragraph 18, although the line be short and although the character of the service contemplated be that commonly rendered to industries by means of spurs or industrial tracks. Being an extension, it cannot be built unless the federal commission issues its certificate that public necessity and convenience require its construction. The Hale-Cement Line is clearly an extension within this rule." (Emphasis added.)

The defendant places its principal reliance on the case of Pennsylvania Railroad Co. v. Reading Co., 132 F.Supp. 616 (D. Pa.), aff'd per curiam 226 F.2d 958 (3rd Cir.). In that case, the Pennsylvania Railroad sought to enjoin the construction of railroad facilities to a Philadelphia Electric Company plant by the Reading railroad. Both companies had furnished freight service to industries, such as the Philadelphia Electric, in the Schuylkill valley for many years. Each had railroad sidings into fourteen plants. The plant was constructed in 1950 and the Pennsylvania Railroad was the only carrier serving it until the action was brought in 1955.

The Reading spur was to be 1,877 feet in length. It was to begin at the main line of Reading on the east bank of the Schuylkill River and cross the River to the plant on the west bank. The cost of the facilities was approximately $1,000,-000.00. The court articulated certain indicia of a spur or an extension which

it found other authorities to have considered. On p. 621, the court elaborated the criteria as:

"Will the proposed track connection serve only a single carrier? (Citations omitted.)

Will the construction provide passenger, telephone, telegraph, loading platform, station or station agent's service? (Citations omitted.)

Is the length of the construction so great so as to be considered in the nature of a branch line? (Citations omitted.)

Will the connecting trackage be used only for switching service incidental to line haul movement? (Citations omitted.)

Does it invade the territory of another railroad? (Citations omitted.)

Will it involve special financing or condemnation proceedings? (Citations omitted.)

Is the cost reasonable for an industrial spur in the light of the traffic involved and has the railroad been requested by the customer to give it service? (Citations omitted.)

Will the proposed connection provide service to the single customer similar to that provided other industries in the same area and similarly situated? (Citations omitted.)"

The Court held the track to be a spur under the standards pronounced by it. It felt the two critical features of a spur which had been highlighted in the Texas & Pacific case were present—that the tracks were "to improve the facilities required by shippers already served by the carrier or supply facilities to others who being within the same territory and similarly situated are entitled to like service from the carrier." The former was said to exist because both carriers had served Philadelphia Electric in southeast Pennsylvania on an equal basis for decades. The latter existed as a result of the fact that Reading supplied fourteen industries within a ten mile radius and because both roads maintained parallel lines on oppo-

site sides of the River which repeatedly crossed it to reach industries.

■ The link of trackage in question has the classic physical characteristics of a spur or industrial track as articulated in the Reading case. The trackage will meet the demands of only one shipper, its old customer Celotex, who has requested its installation. It is manifest that its use in switching will be subordinate or incidental to line haul movement and that it will not supply passenger, telephone, telegraph, loading platform, station or station agent's service. Used ninety pound rails are to be laid. It is a relatively short line of 3,888 feet which unites with the Celotex track at one end and the main line at the other. The cost is modest in light of the traffic it will accommodate. The cost is $53,334.-00. It will carry 1,000 cars from the Celotex premises each year, or 500 in excess of its present work load. The revenue would be great in comparison with the cost. No special financing will be required and the track is to be constructed exclusively on the property of Celotex and the Illinois Central without the necessity of condemnation. In short, the nature and substance of this appendage is that of a spur or industrial track rather than of an extension.

■ The real dispute between the parties is as to whether the track invades the territory of the Great Western and the Fort Dodge, Des Moines & Southern. The burden of proof on this issue is upon plaintiffs. Georgia Southern & F. Ry. Co. v. Atlantic Coast Line R. Co., 250 F. Supp. 260 (D.Fla.); New York Central R. Co. v. Southern Ry. Co., 226 F.Supp. 463 (D.Ill.). The only substantial evidence which the plaintiffs rely upon to support the theory that it is their territory is the fact that they have exclusively served Celotex since the new plant was opened in 1958. Thus, the issue becomes whether or not that fact, in and of itself, is sufficient to preclude this track as an extension. The Court is firmly convinced that it is not.

The track proposed by the Illinois Central is a "spur" or "industrial" track.

Little distinction is made between the two. New Orleans Terminal Company v. Spencer, 255 F.Supp. 1 (D.La.). Irregardless of the fact that plaintiffs have maintained the sole outlet for Celotex since 1958, the Illinois Central is merely attempting to enlarge the facilities of a shipper "already served" by it. As in the Reading case, supra, the alleged impinging carrier is not presently serving the plant in question but the Illinois Central provided a means of transportation for Celotex for a period of 55 years prior to the entrance of plaintiffs in 1958. The tracks to the Wassem plant are still actively in existence and are on Celotex land. The Court fails to see any meaningful distinction between the Reading case and the case at hand based upon the fact that Reading was serving Philadelphia Electric elsewhere in southeastern Pennsylvania. Here the phrase "already served" would be construed to mean "already served" *previously* instead of "already served" *elsewhere* as in Reading. Further, it would appear that in 1958 the new Celotex plant was rightfully the defendant's territory at least as far as Great Western is concerned. The new plant is only 1800 feet from the old plant and the Illinois Central had been serving it. Can it now be said that Great Western has a superior right to the flow of cars from Celotex?

But even if the Illinois Central did not already serve Celotex, the proposed construction must be held to be within the boundaries of its natural and historic domain in the gypsum area. As mentioned, it has long been engaged in moving cars for Celotex and its predecessor. It renders similar services to National Gypsum Company and Bestwall Company which are in the same mining area. It will also haul for the neighboring United States Gypsum Company in the future by virtue of an agreement with the plaintiffs herein. The area involved is not a spacious industrial complex such as those in which conflicts between railroads have arisen in other cases, but it is a limited territory east of Fort Dodge in which few plants are located.

Moreover, it would seem that the facts of the instant case militate more strongly for holding the track to be a spur or industrial track than those of the Reading case. In the Reading case, both carriers served Philadelphia Electric on an even basis elsewhere in Pennsylvania, but Reading did not serve the plant in question in that case. The Supreme Court remarked, 270 U.S. on p. 277 of the Texas & Pacific case, 46 S.Ct. on p. 266, that: "By that measure, Congress undertook to develop and maintain, for the people of the United States, an adequate railway system." In light of this statement, it would seem that the most relevant factor in these cases would be what the competitive situation at this particular plant is. The Pennsylvania Railroad had always been the sole carrier for Philadelphia Electric at the Cromby plant. Undoubtedly, it was injured and Reading benefited by permitting Reading to serve that plant. Here, not only has there been an historical competitive environment between the Illinois Central and the Fort Dodge, Des Moines & Southern at the very land in controversy, but also Celotex was only first served by the Great Western in 1958.

The Texas & Pacific case, supra, does not command the same result in the present situation as it is very dissimilar factually. There was a bald endeavor by the Santa Fe to invade a totally new territory in that case. The services of the Texas & Pacific had been essential to the development of the district and the area was pervasively occupied by the Texas & Pacific. Gulf desired to build a seven and one-half mile track to bridge the gap between its main line and a rich industrial district. The Santa Fe had no branch running "near to, or in the direction of" the district.

Counsel for plaintiffs have supplied the Court with a number of authorities which it feels obligated to examine. Considerable emphasis is placed upon the factual setting which arose in the case of New York Central R. Co. v. Norfolk & Western Ry. Co., 214 F.Supp. 549 (D.W. Va.). There are some similarities between the facts of that case and those of the case at hand. That litigation involved a proposed track of 2,640 feet to be built to a Union Carbide plant by the Norfolk & Western in order to provide it with a direct route to the plant. The track was incidental to line haul movement. The Norfolk & Western and Union Carbide would have benefited by the direct route and the New York Central would have been eliminated from participation in the revenue of such traffic. The line would have served only Union Carbide. The cost of the construction would have been $42,000.00 of which $26,500.00 would have been paid by Union Carbide. Similarly, no passenger or other services or facilities were to be provided. Finally, no special financing or condemnation of property was necessary.

However, contrary to plaintiffs' position, the case is readily distinguishable. The crux of the Court's opinion was that the Norfolk & Western was trying to invade a territory not previously served by it. The reasons for that conclusion are plainly visible from the opinion. The Central had served the north side of the Kanawha River for many years. The Virginian Railway Company, which was later merged with the Norfolk & Western, maintained lines on the south bank of the Kanawha. In order for the Central to move cars to the Virginian, it had to use the Chesapeake and Ohio Railway for some 34 miles. In 1929 the Central and the Virginian filed a certificate of convenience and necessity with the Interstate Commerce Commission for an extension of the Virginian's main line over the Kanawha River to a point where it would connect with the Central on the north side of the River. They desired to provide a competitive route from the Tidewater to the Great Lakes without the dependence of the Central on the Chesapeake & Ohio. At hearings on the Application, there was a representation that the extension would not fill local needs nor originate traffic. A Commission Report specifically stated that: "There is to be no extension of applicant's line for freight service." The certificate was

granted and the extension was built over the "Deepwater bridge." The proposed track to the Union Carbide plant would have begun at the northerly end of the Deepwater bridge. Further, there were certain reciprocal agreements between the Virginian and the Central as to hauling and control of the facilities on the north side of the River.

■ The New York Central decision imposes an additional test to be met in addition to those enumerated in the Reading case. 214 F.Supp. at p. 553, the Court would inquire:

"Is the territory to be served by the proposed track within or adjacent to a general area or community already being adequately served by another carrier?"

The Court does not feel that that standard was intended to encompass the situation in which the carrier seeking to build the track has previously been rendering services in the general area and to the particular shipper. Cf. Missouri Pacific R. Co. v. St. Louis Southwestern Ry. Co., 73 F.2d 21 (8th Cir. 1934); Missouri Pacific R. Co. v. Chicago, Rock Island and Pacific Ry. Co., 41 F.2d 188 (8th Cir. 1930). The case itself dispels any such idea. The Court included that test in a group of "six items, all of which are directed to the question of whether the construction constitutes an invasion of the territory of another carrier." And the Court, after delineating the tests, immediately explained the Reading case on the ground that a competitive situation already existed. 214 F.Supp. on p. 553, the Court relates that:

"In the great majority of cases, however, where a competitive condition does not exist between the carriers and the proposed construction will invade new territory not previously served, the construction has been held to be an extension within the meaning of Section 1(18) * * *."

■ It is settled law that a territory can be adjacent to or tributary to more than one carrier and served by them. See, e. g., Missouri, K. & T. R. Co. of

Texas v. Texas & N. O. R. Co., 172 F. 2d 768 (5th Cir.) and Georgia Southern and Florida Ry. Corp. v. Atlantic Coast Line R. Co., 250 F.Supp. 260 (D.Fla.).

But assuming the test were to be answered even when the constructing carrier had historically inhabited the area in which the track was to be laid, the response would have to be in the negative in the instant case. It appears that the plant is not being adequately served.

■ The Court wishes to emphasize that it hesitates to embark upon an exploration of this subject as there is a line of authority which views it to be a matter of public convenience and necessity, and, therefore, for the Commission. See, e. g., Missouri, K. & T. R. Co. of Texas v. Texas & N. O. R. Co., supra; New York Central R. Co. v. Norfolk & Western Ry. Co., supra; Chicago, Rock Island and Pacific R. Co. v. Chicago and North Western Ry. Co., supra; Chicago, Rock Island and Pacific R. Co. v. Thompson, 135 F.Supp. 43 (D.Ark.). Also, the adequacy of existing services is a highly relevant factor in the determination of public convenience and necessity by the Commission. See, e. g., Wycoff v. United States, 240 F.Supp. 304 (D.Utah); Zuzich Truck Line, Inc. v. United States, 224 F.Supp. 457 (D.Kan.); Roadway Exp., Inc. v. United States, 213 F.Supp. 868, aff'd 375 U.S. 12, 84 S.Ct. 53, 11 L.Ed.2d 38 (1963); Chicago, Rock Island and Pacific R. Co. v. United States, 205 F. Supp. 378 (D.Ill.).

But if the adequacy of service is a relevant factor for the courts, the evidence in this case paints a picture of a serious inefficiency in the operation of the Celotex plant. The plant is not operating near its peak capacity. It is deprived of markets which it could serve if it were not for the present delay in movement and there is testimony that it could serve old customers more expeditiously if the new track were allowed.

The plaintiffs stress Missouri Pacific Ry. Co. v. St. Louis Southwestern Ry. Co., supra, as the most important case in this Circuit bearing on the matters involved here. The Court agrees, but

again there are crucial differences between that case and the case in controversy. In that case, the defendant desired to lay nearly a mile of track for a direct route to two industries already adequately served by the direct lines of two railroads. In order to construct the line, it would have been necessary to build across the plaintiff's tracks to the plants. The Court held that: "The proposed line would *invade a territory* now adequately occupied by other lines of railroad and in which the appellant now has *no trackage whatever.*" (Emphasis added.)

The plaintiffs can gain no comfort from the case of El Dorado & Wesson Ry. Co. v. Chicago, Rock Island & Pac. Ry. Co., 5 F.2d 777 (8th Cir. 1925). The defendant therein was interested in extending its railroad on land which was exclusively within the right of way of the complainant and in crossing four of the complainant's tracks on its terminal grounds at El Dorado, Arkansas. Such an extension would have seriously interfered with the complainant's operation of its terminal and tracks. Moreover, the Court noted that the defendant would not gain any revenue by the measure and prevention of its construction did not seem "injurious, inequitable, or unjust to that company."

In Chicago, Rock Island & Pac. R. Co. v. Chicago and North Western Ry. Co., 188 F.Supp. 549 (D.Ill.), cited by plaintiffs, the defendant's proposed track would have extended to a new industrial area which by chance was located immediately adjacent to plaintiff's line and which had never before been served by defendant. Plaintiff had already constructed one spur to the industrial park and had a second under construction. Defendant's main line was one and three-tenths mile distant from the park.

Finally, in the case of Chicago & Eastern Illinois R. Co. v. Illinois Central R. Co., 261 F.Supp. 289 (D.Ill.), the Court held that an Illinois Central track was an extension and found "only that it invades territory that is neither tributary to, nor already being served by, the constructing carrier." The Illinois Central track would have had to cross the line of another carrier and an Interstate Commerce Commission opinion was felt to be persuasive as to the fact that the track would extend into virgin territory. The other facet of the case does not merit attention.

Therefore, the cases to which the Court has been referred by plaintiffs do not diminish the Court's conviction upon what it conceives to be the proper outcome herein.

For the foregoing reasons, it will be ordered that the prayer of plaintiffs for a permanent injunction against the construction of the track in question by defendant is denied.

It is ordered that the foregoing shall constitute the findings of fact, conclusions of law, and Order for Judgment in this case. Rule 52(a) of the Federal Rules of Civil Procedure.